Ordell WEILAND, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. C02–4013–PAZ.

United States District Court,
N.D. Iowa,
Western Division.

Dec. 23, 2002.

Steven T. Roth, Roth Law Office, Storm Lake, IA, for Plaintiff.

Martha A. Fagg, U.S. Attorney's Office, Sioux City, IA, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

ZOSS, United States Magistrate Judge.

### TABLE OF CONTENTS

I.   INTRODUCTION ................................................876

II.  PROCEDURAL AND FACTUAL BACKGROUND ...........................876
     A.   Procedural Background................................876
     B.   Factual Background...................................877
          1.   Introductory facts and Weiland's daily activities ....................877
               a.   Hearing testimony ..........................877
               b.   Other evidence .............................879
          2.   Weiland's medical history .......................880
          3.   The ALJ's conclusion ...........................881

III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
     THE SUBSTANTIAL EVIDENCE STANDARD ...........................884

IV.  ANALYSIS ...................................................885
     A.   Legal Principles ....................................885
     B.   Analysis of the Record ..............................890
     C.   Application of Law and Facts to Weiland's Claim .......894

V.   CONCLUSION .................................................897

### I.  INTRODUCTION

The plaintiff Ordell Weiland ("Weiland") appeals the decision by an administrative law judge ("ALJ") denying him Title II disability insurance ("DI") benefits. Weiland argues the ALJ's determination that he performed substantial gainful activity after his alleged disability onset date was not supported by substantial evidence on the record as a whole.

### II.  PROCEDURAL AND FACTUAL BACKGROUND

#### A.  Procedural Background

On August 3, 1998, Weiland filed an application for DI benefits (R. 121–23), alleging a disability onset date of June 18, 1987, due to shoulder, back, arm, and wrist problems. The application was denied because Weiland allegedly had engaged in substantial gainful activity after his alleged disability onset date and through the date his insured status expired.[1] (R. 32) Weiland requested a hearing, which was held before ALJ Virgil E. Vail in Spencer, Iowa, on April 9, 1999. (See R. 46–120) Attorney Steven Roth represented Weiland at the hearing. Weiland testified at the hearing, as did his wife Mary and his son Cory Wieland. On June 1, 1999, the ALJ ruled Weiland was not entitled to benefits. (R. 29–42) The Appeals Council of the Social Security Administration denied Weiland's request for review on January 9, 2002 (R. 4–5), making the ALJ's decision the final decision of the Commissioner.

Weiland filed a timely Complaint in this court on March 7, 2002, seeking judicial review of the ALJ's ruling. (Doc. No. 1) On April 3, 2002, the parties consented to jurisdiction by the undersigned United

---

1.  His insured status expired on December 31, 1993.

States Magistrate Judge, and Chief Judge Mark W. Bennett transferred the case to the undersigned. (Doc. No. 4) Weiland filed a brief supporting his claim on June 10, 2002 (Doc. No. 12). On July 22, 2002, the Commissioner filed a responsive brief (Doc. No. 14). On August 2, 2002, Weiland filed a reply brief. (Doc. No. 14) The court now deems the matter fully submitted, and pursuant to 42 U.S.C. § 405(g), turns to a review of Weiland's claim for benefits.

## B. Factual Background

### 1. Introductory facts

#### a. Hearing testimony

Weiland was born on March 15, 1948. At the time of the hearing, he was 51 years old. (R. 50)

Weiland had difficulty in school, and quit at age 16, after completing the ninth grade. (R. 50–53). He worked at a creamery for about a year-and-a-half, and then drove a fork lift at a grease gun factory for three to four years. (R. 53–54) In 1970, he began working at a packing plant, where he worked until 1989.[2] (R. 55)

During his tenure at the packing plant, Weiland typically worked 45 to 50 hours per week, from 4:30 a.m. to 3:30 p.m. each work day. (R. 59–60, 63) He left that employment because of injuries to his shoulders, hands, knee, and back. (R. 60) At the time of the hearing, Weiland had been married to his wife, Mary, for 26 years. (R. 58) Throughout their marriage, they lived in a house on five acres in a

rural setting, where they raised three children. (R. 59) They also had a cattle shed and a hatchery building on the acreage. (Id.)

Beginning in 1970, the Weilands raised livestock on the acreage. (R. 61) By the mid–1980s, they typically had on hand approximately 25 calves, 75 hogs, and 6 sheep. (Id.) Weiland's children all helped with the livestock, beginning when they were as young as age six. (R. 61) Weiland testified his wife and children were primarily responsible for raising the livestock, which included doing chores each morning and evening. (R. 61–62) Weiland estimated that while he was working at the packing house, he provided ten percent of the care for the livestock. (R. 63–64)

After Weiland left his job at the packing house, his family continued to raise livestock on their acreage, and also started up a chicken hatchery. (R. 64–65) Weiland and his wife took a one-week training course at a community college on how to operate a hatchery. (R. 64, 84–86) Weiland used some money from a worker's compensation settlement and borrowed $3,000 on a personal loan from the Small Business Administration[3] to buy the necessary equipment to start the hatchery.

The Weilands operated the hatchery six months out of each year. (R. 70–71) In the months the hatchery was in operation, they would order eggs in response to customer demand for chickens. The eggs would be delivered to the hatchery, where they would be placed in incubators. (R. 65, 67, 74–75) They would remain in the

2. Toward the end of his employment, Weiland's work tapered off because of injuries. In 1987, his W–2 wages from the packing plant were $2,079. In 1988, his W–2 wages were $1,670. In 1989, his W–2 wages were $4,075.60. In 1990, he received a W–2 from the packing plant showing $99.45 in wages. (R. 78–80)

3. There is some question in the record about whether the loan was a standard SBA loan or a loan under a government program for persons with disabilities. See testimony of Mary Weiland, R. 106–07.

incubators for 19 days, and then would be moved to another location, where they would hatch on the 21st day. (R. 67) After the chickens hatched, they would be picked up by the customers who had ordered them. (Id., R. 75)

According to Weiland, his wife and children did most of the work required to operate the hatchery (R. 69–70), although twice a day he would check on and adjust the temperature and moisture in the incubators. (R. 65–67) Sometimes Weiland also would move eggs from one tray to another or sweep up egg shells. (R. 68–69, 76) Weiland estimated it took about three to four hours of labor a week to operate the hatchery, and he contributed 10 to 20 percent of the work. (R. 70) He testified that the largest number of chickens they hatched at one time was 1,500. (R. 93)

According to Weiland, the family stopped operating the hatchery in about 1997, because the children had grown up and left the home [4] and his wife had a full-time job. (R. 70) According to Weiland, as his children left home, his wife took up the slack. (R. 76–77) He testified, "I couldn't handle it by myself because I didn't do that much of it." (R. 70) At the time of the hearing, there was "very little" livestock on the acreage, and the livestock all was taken care of by Weiland's wife. (R. 71, 94)

In response to questions by the ALJ, Weiland stated his wife did substantially all of the work in the livestock operation even when she was working at up to three other jobs. (R. 87–90) He testified he occasionally would borrow money from his bank, in his own name, to finance the family's livestock operations. (R. 91) He acknowledged he was listed as the operator of the livestock operations on the joint income tax returns he filed with his wife. (R. 87) Weiland acknowledged he occasionally would check on the livestock. (R. 92) When asked who took care of feeding the livestock and giving them their injections, Weiland responded, "My son." (R. 90–91) When asked who decided to sell the livestock, Weiland replied, "It's certain times of the year you just load them up and sell them." (R. 91)

Weiland's wife, Mary, testified at the hearing. She stated their son Cory continued to live at home for three or four years after graduating from high school, until about 1995. (R. 96) Although Cory had a full-time job at a grocery store, he also helped with the livestock at home. (R. 96, 100) When he moved out of the Weilands' house, he lived three or four miles from the acreage and he continued to come home to help with the livestock. (R. 95, 100)

Mary corroborated Weiland's testimony that while the children were living at home, she and the children did most of the chores for the livestock operation. (R. 97) She testified that when her husband was working at the packing house, he helped with the livestock "a little bit at night," but "after he hurt his shoulders, he couldn't do much at all so then it was mainly up to the kids and I, but he would do, walk out and check them or maybe hold a hose to water the calves in a trough." (R. 98)

Mary estimated that before Weiland's shoulder injury, she and her husband each did about half the work on the livestock operation, but from the time Weiland hurt his shoulder in 1983, his participation decreased steadily. By the time he quit working at the packing plant in 1989, his participation in the work required to run the livestock operation was down to ten

---

4. Jody left home in 1989, and Tammy left in 1992. While the record is somewhat confusing, it appears Cory left home in 1995. (R. 75, 81, 96)

percent. (R. 98–99) Mary testified the hatchery was a six month-a-year operation, and while it was in operation, the only physical work performed by her husband was to sweep up egg shells. (R. 101–02) She testified Weiland has been unable to do any "substantial physical function" since injuring his shoulder because he has been in too much pain. (R. 102, 105)

Mary acknowledged that she had prepared the Weilands' tax returns, and had listed her husband as the owner of the livestock operation on the schedules. She testified she did this because she was told to do so by someone who was giving her advice on how to prepare the returns.[5] (R. 103–04)

In response to questioning by the ALJ, Mary stated her husband's disabilities all are physical, and he has no mental impairments. (R. 105) She confirmed that she and her husband jointly managed the livestock business. (R. 105–06) She testified that starting the hatchery was her idea, and she attended the training program on how to operate a hatchery with her husband. (R. 106–07) She also explained to the ALJ how she was able to work at her other jobs and still have time to do most of the work necessary to raise the livestock. (R. 108–09)

Weiland's son Cory testified that beginning at age seven or eight, he helped his mother and sisters with the family livestock operation. (R. 111–12) He recalled that his father did "very little" of the physical work involved in the operation. (R. 112, 114) He testified that after his father stopped working at the packing plant, he did none of the physical work at the hatchery except for checking the temperature gauges each day. (R. 112, 114) After Cory moved out of the Weilands' home, he continued to help his parents with livestock on the acreage "two to four times a week." (R. 113)

In response to questioning by the ALJ, Cory stated he and his father jointly made most of the decisions concerning the livestock operation. (R. 115–17)

### b. Other evidence

The record contains copies of the Weilands' income tax returns from 1987 through 1997. (R. 148–50, 169–298). These records show the Weilands' earnings in connection with the livestock and hatchery activities as follows:

|  | Livestock Bought For Resale | Livestock Gross Income | Livestock Net Income | Hatchery Gross Income | Hatchery Net Income |
|---|---|---|---|---|---|
| 1987 | $35,404.19 | $14,117.65 | $   684.69 | ------------- | ------------- |
| 1988 | $34,497.31 | $11,665.36 | -$   223.51 | ------------- | ------------- |
| 1989 | $34,066.60 | $14,918.07 | -$ 3,248.47 | $ 5,028.29 | -$ 1,478.86 |
| 1990 | $54,643.82 | $19,550.38 | -$ 2,267.83 | $ 5,767.30 | -$   936.81 |
| 1991 | $57,118.21 | $19,667.05 | -$ 3,409.43 | $ 3,809.65 | -$   603.64 |
| 1992 | $43,355.00 | $13,777.00 | -$ 1,438.00 | $ 6,106.00 | -$ 1,183.00 |
| 1993 | $72,664.00 | $20,514.00 | -$ 5,502.00 | $ 6,208.00 | -$ 1,065.00 |
| 1994 | $73,391.00 | $19,972.00 | -$ 7,133.00 | $ 3,623.00 | -$ 1,124.00 |
| 1995 | $84,447.00 | $18,430.00 | -$10,868.00 | $ 4,771.00 | -$   519.00 |
| 1996 | $50,125.00 | $24,103.00 | -$ 6,765.00 | $ 2,070.00 | -$   549.00 |
| 1997 | $46,336.00 | $17,174.00 | -$14,044.00 | ------------- | ------------- |

5. She testified she wanted to have both her name and her husband's name on the schedules for the hatchery, but a man who helped her prepare the tax returns told her, "Weiland Hatchery couldn't have two names and the farm couldn't have two names." (R. 104–05)

On October 4, 1988, Mary Weiland wrote a letter stating the following:

Since [my husband's] shoulders cannot take the work at [the packing plant,] we have been planning on opening a small business of our own. We have been working with Jo Weese with Job Service Rehabilitation. We plan to open a hatchery. We are planning on hatching chickens and maybe ducks and geese. We spent 3 days in Des Moines and they will help us with buying the incubators and a generator. We have also applied for a small business loan and will receive both.

If you have more questions please contact us. We sure hope that we can continue with the disability for awhile—at least until the hatchery is going and we have some income off of that.

(R. 399)

On March 10, 1992, Weiland completed a "Continued Disability Insurance Claim" form. (R. 406) In response to the question, "What are your daily activities and how do you spend your time?" he stated, "Light work, driving, check incubators." (Id.) On an April 23, 1993, "Continued Disability Insurance Claim" form, he gave the same answer. (R. 408) On a July 28, 1998, "Continued Disability Insurance Claim" form, he reported his activities as "light work deliver[ing] baby chicks." (R. 347)

### 2. Weiland's medical history

A detailed chronology of Weiland's medical history is attached to this opinion as Appendix A. The court will summarize here the references in these records to the Weilands' livestock and hatchery operation.

On June 12, 1990, Weiland saw Dr. Wesley Parker for bilateral rotator cuff syndrome, and reported he had been trained as a "Hatchery Manager." (R. 325, 421) In his office notes, Dr. Parker stated the following:

[Weiland] has been able to do this although still having difficulty with any significant movement of the [upper extremity]. He stated the other day he had to change a tire & felt significant pain & swelling in the joints after that. He was unable to lift a milk jug off the table post changing the tire.

(Id.) On February 20, 1992, Weiland saw Dr. Parker for chronic bilateral rotator cuff syndrome. (R. 418) Dr. Parker noted, "[Weiland] is involved in his new business, a hatchery. He is unable to do this on his [own], but does enlist the help of his family." (Id.) On May 7, 1992, Dr. Parker completed a disability questionnaire for Weiland. (R. 415–17). On the questionnaire, Dr. Parker opined, "The patient is unable to do any lifting. He can only do the managerial function." (R. 416) He believed Weiland should be able to perform certain of the activities involved in running the hatchery,[6] "except prolonged use of his upper extremities in outstretched position may exacerbate his pain. No heavy lifting more than 20 pounds." (R. 416)

On April 20, 1993, Dr. Parker completed a statement of disability for Weiland. (R. 323) Dr. Parker reported, "[Weiland] recently did some increased work with lifting baby chicks['] crates[,] moving them back and forth within his chicken hatchery."

---

**6.** These activities were as follows:

The duties involved in the chicken hatchery include checking to make sure the machines are running properly during hatching season, turning the eggs, putting the eggs in the trays and then into the hatcher, removing the chicks, feeding/watering the chicks, boxing the chicks, paperwork, and sales calls.

(R. 416)

(*Id.*) On March 8, 1994, Weiland reported to Dr. Parker that the hatchery "has gone relatively well for him." (R. 322) On April 23, 1996, Dr. Parker completed an "Attending Physician's Statement of Disability" form, stating Weiland was not able to work at his regular occupation, but was employed at a hatchery. (R. 411) On March 10, 1997, Dr. Parker entered the following note in his office records: "[Weiland] does run a hatchery and does a lot of the domestic house work at home. If he does not do any heavy lifting or repetitive shoulder work, he gets along relatively well." (R. 321) On June 12, 1997, Dr. Parker noted Weiland's chicken hatchery "has been going relatively well." (R. 341) On an "Attending Physician's Statement of Disability" completed that same day, Dr. Parker repeated Weiland was not able to work at his regular occupation, but was self-employed at a hatchery. (R. 412)

On May 22, 1998, Dr. Parker summarized Weiland's subjective complaints, as follows:

Patient is a 50 year old complaining of bilateral shoulder pain. Patient was on disability from his own insurance policy since 9–20–89. Patient had been seen by Dr. Wheeler, orthopedic physician, at that time who advised him not to do any further repetitive activity of his upper extremities. Apparently additionally saw a specialist in Omaha although do not have these notes. Patient went through Job Service and was trained as a Hatchery Manager. Patient states that he does not have his High School diploma, making job placement harder. He is concerned about applying for Social Security Disability as his shoulders cause him any pain with repetitive activity using his upper arms. He cannot do any work with his hands as this causes his hands to swell. He is having some discomfort with paresthesias involving his fingers which appear to be more in the median nerve distribution. He complains of pain when he drive[s] the car for any prolonged period of time. Patient takes Aleve two tablets 2 x/day and sometimes fills in with an additional Advil or Tylenol. He used to take Tylox for the discomfort but over time has not needed that. He tries to decrease his activity the best possible; however, when he does increase he just ends up with more discomfort. He denied any chest pain, shortness of breath, or abdominal pain. No prior [history] of cardiovascular, pulmonary, GI or renal disease. No prior [history] of asthma, HTN or seizures. He does smoke 1.5 [packs per day]. States alcohol of less than a six pack per week.

(R. 317)

On July 23, 1998, Dr. Parker noted the following history:

[Weiland] did get full disability around 1988 or 1989. He did go to vocational rehabilitation and had a chick hatchery which did not require much lifting[;] however it did require some repetitive movement of his upper shoulders. Even with doing this light work, he was unable to tolerate this.

(R. 344) On April 8, 1999, Dr. Parker wrote to Weiland's attorney that Weiland "has tried to go through Vocational Rehabilitation and did run a hatchery farm, but despite doing this he is still unable to complete all duties due to the repetitive movement of the upper extremities." (R. 310)

### 3. The ALJ's conclusion

The ALJ framed the issue to be decided as "whether [Weiland]'s work activity subsequent to June 18, 1987, and through December 31, 1993, constituted substantial gainful activity within the meaning of the Social Security Act." (R. 32) The ALJ con-

cluded Weiland "was not disabled prior to December 31, 1993, and is not entitled to disability insurance benefits under title II of the Social Security Act." (*Id.*) In support of this conclusion, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on June 18, 1987, the date that the claimant stated [he] became unable to work, and continued to meet them through December 31, 1993.

2. During the period 1987 through 1997[,] the claimant was involved in self-employment activity in raising and selling livestock and/or operating a hatchery.

3. The claimant's activity in connection with the operation of the hatchery and livestock operation involved significant physical or mental activities for pay or profit (20 CFR 404.1573).

4. The claimant's work activity constituted substantial gainful activity within the meaning of the regulations (20 CFR 404.1572).

5. The claimant was not under a "disability" as defined in the Social Security Act, at any time through December 31, 1993.

R. 41–42.

In reaching his conclusions, the ALJ pointed out the Social Security Administration had determined Weiland's involvement in self employment activities in all years after 1987, constituted "substantial gainful employment" under the Social Security Act and the regulations. (R. 34) He then summarized Weiland's income, expenses, and net profit from the livestock operations in the years 1987 through 1997 (R. 33–35), and cited various references to the livestock operation and hatchery in the medical records and other documents in the record. (R. 38–39) He also reviewed the testimony given at the hearing. (R. 36–38)

From this evidence, the ALJ was not convinced Weiland's "participation in the livestock operation and hatchery was as limited and insignificant as described." (R. 39) He reasoned as follows:

The claimant's wife testified she prepared the returns herself and relied on information from another source in completing the self-employment returns showing the claimant as sole proprietor believing her name could not be listed. However, that does not explain the fact that the couple's 1992, 1993, 1994, 1995, 1996 and 1997 income tax returns were prepared by a third party and the income generated from the livestock operation and the hatchery was once again reported solely in the claimant's name (see Exhibits 16 through 21). If indeed the previous years' returns had inappropriately been filed and a partnership return should have been filed for the livestock operation and/or hatchery, the couple would have at that time had the opportunity to discuss such with a professional tax preparer and filed appropriate amended returns.

With regard to the hatchery business, the record more convincingly shows the claimant was trained for such work by Vocational Rehabilitation, he secured a loan in his name for the necessary equipment and building, and income generated from such business was appropriately reported in his name for income tax purposes. As noted above, various notes in the medical records submitted show the claimant was indeed involved in the operation of that business. Testimony at hearing was that individuals called the home and placed orders for a certain number of chicks. Presumably, the claimant was the individual who took such orders since his

wife was employed during the day and his children were in school during three months of the six months the hatchery was active and operating. Thus, the claimant would have been the individual responsibility [sic] for determining whether orders could be filled and ordering the appropriate number of eggs to fill the orders. While he may have enlisted the help of his wife and children at times, at best this could be considered a partnership with his wife since they continued to operate the hatchery after their children had left home. The undersigned does not accept the argument that the claimant's wife performed all of the duties involved in the hatchery business such as taking orders, ordering the appropriate number of eggs, being available for the egg deliveries, putting the eggs in the incubator, moving the eggs from one tray to another for hatching and being responsible for individuals picking up the chicks and/or delivering the chicks.

With regard to the livestock operation, counsel also argues the duties involved in this business were performed by the claimant's wife and his three children. However, it was the claimant who bought and sold livestock, made arrangements for any necessary loans, and who presumably ordered feed and any necessary veterinarian care. While the three children may have helped in connection with the livestock operation they were nonetheless in school and the couple's son had a part-time job after school. The son testified he had input into the buying and selling of cattle, however, he had no legal standing to buy or sell livestock owned by the claimant nor did he have authority to make arrangements for loans for the purchase of livestock. These are management decisions which could only have been made by the claimant in connection with the operation of a livestock business in his name as sole proprietor.

Counsel has presented argument that claimant's wife (and their children) performed all of the duties involved in the hatchery business in addition to working full-time outside the home, working half days on Saturdays, and buying/selling livestock, feeding and watering the livestock, checking on the livestock, calling the veterinarian as needed, as well as a host of other duties involved in a livestock operation. Income tax returns show the claimant no longer reported income from the hatchery business after 1995. However, after the children left home (testimony was that Jodi left home in 1989, Cory in 1991 (or 1994 or 1995), and Tammy in 1992) the livestock operation actually increased rather than decreased with tax returns showing the livestock bought for resale increasing from $43,335 in 1992 to $72,664 in 1993, $73,391 in 1994, and almost doubling from 1992 at $84,447 in 1995. There is no reasonable explanation as to how the claimant's wife could have handled the size of these operations in addition to full-time employment outside the home[;] income tax returns do not reflect any extra wages paid for hired help, and no reasonable explanation has been provided as to who performed the work if the claimant did not.

(R. 39–41)

The ALJ concluded by stating "the greater weight of the evidence supports a finding that the claimant's involvement in a livestock operation and hatchery meets the test for substantial gainful activity as a self-employed individual as described above. Thus, he cannot be found disabled within the meaning of the Social Security Act." (R. 41)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists ... in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; see Kelley v. Callahan, 133 F.3d 583, 587–88 (8th Cir.1998) (citing Ingram v. Chater, 107 F.3d 598, 600 (8th Cir.1997)). First, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. Second, he looks to see whether the claimant labors under a severe impairment; i.e., "one that significantly limits the claimant's physical or mental ability to perform basic work activities." Kelley, 133 F.3d at 587–88. Third, if the claimant does have such an impairment, then the Commissioner must decide whether this impairment meets or equals one of the presumptively disabling impairments listed in the regulations. If the impairment does qualify as a presumptively disabling one, then the claimant is considered disabled, regardless of age, education, or work experience. Fourth, the Commissioner must examine whether the claimant retains the residual functional capacity to perform past relevant work.

Finally, if the claimant demonstrates the inability to perform past relevant work, then the burden shifts to the Commissioner to prove there are other jobs in the national economy that the claimant can perform, given the claimant's impairments and vocational factors such as age, education and work experience. Id.; accord Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir.1998)).

Governing precedent in the Eighth Circuit requires this court to affirm the ALJ's findings if they are supported by substantial evidence in the record as a whole. Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002) (citing Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.2000)); Weiler, supra, 179 F.3d at 1109 (citing Pierce v. Apfel, 173 F.3d 704, 706 (8th Cir.1999)); Kelley, supra, 133 F.3d at 587 (citing Matthews v. Bowen, 879 F.2d 422, 423–24 (8th Cir.1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier, id.; Weiler, id.; accord Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000)); Hutton v. Apfel, 175 F.3d 651, 654 (8th Cir.1999);

*Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993).

■ Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier,* 294 F.3d at 1022 (citing *Craig,* 212 F.3d at 436); *Wilcutts v. Apfel,* 143 F.3d 1134, 1136 (8th Cir.1998) (quoting *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)); *Gowell, id.; Hutton,* 175 F.3d at 654 (citing *Woolf,* 3 F.3d at 1213); *Kelley,* 133 F.3d at 587 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)).

■ In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.,* 879 F.2d 441, 444 (8th Cir.1989) (citing *Steadman v. S.E.C.,* 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981)). The court, however, does "not reweigh the evidence or review the factual record *de novo.*" *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996) (quoting *Naber v. Shalala,* 22 F.3d 186, 188 (8th Cir.1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992),

and citing *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989)); *see Hall v. Chater,* 109 F.3d 1255, 1258 (8th Cir.1997) (citing *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir. 1996)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (citing *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf,* 3 F.3d at 1213). The court may not reverse "the Commissioner's decision merely because of the existence of substantial evidence supporting a different outcome." *Spradling v. Chater,* 126 F.3d 1072, 1074 (8th Cir.1997); *accord Pearsall,* 274 F.3d at 1217; *Gowell, supra.*

## IV.  ANALYSIS

The question presented in this case is a narrow one: Did Weiland perform substantial gainful work activity after June 18, 1987, and through December 31, 1993? If he did, he is not entitled to DI benefits. If he did not, the case must be remanded to the Commissioner to consider the remaining steps of the five-step analysis described above.[7] To answer this question, the court must begin by defining "substantial gainful activity," and discussing the legal principles applicable to Weiland's claim.

### A.  Legal Principles

"[S]ubstantial gainful activity means performance of substantial services with reasonable regularity, either in competitive

---

7. In his brief to this court, Weiland raises a second issue, which he entitles "onset," in which he discusses the question of when he became disabled. (*See* Doc. No. 12, pp. 9–13) This question is not material at the current stage of the proceedings. If Weiland engaged in substantial gainful activity during the relevant period, there can be no finding of disability even if he was, in fact, disabled. 20 C.F.R. § 404.1520(b) ("If you are working

and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience."); *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996); *Comstock v. Chater,* 91 F.3d 1143, 1145 (8th Cir.1996); *Cooper v. Sec'y of Health & Human Servs.,* 919 F.2d 1317, 1319 (8th Cir.1990); *Thompson v. Sullivan,* 878 F.2d 1108, 1110 (8th Cir.1989)

or self-employment." *Markham v. Califano*, 601 F.2d 533, 534 (10th Cir.1979); *Cerrone v. Shalala*, 3 F.Supp.2d 1174, 1178 (D.Col.1998). Under Social Security regulations, "substantial gainful activity" is work that is both substantial and gainful. If a claimant performs substantial gainful activity during an alleged period of disability, the claimant is disqualified from receiving DI benefits. 20 C.F.R. § 404.1520(a) ("If you are doing substantial gainful activity, we will determine that you are not disabled.")

"Substantial" and "gainful" are defined in the regulations as follows:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572.

The regulations contain guidelines on how to determine whether a self-employed claimant has engaged in substantial gainful work activity. The regulations provide:

(a) If you are a self-employed person.... We will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity if you are self-employed. We will not consider your income alone because the amount of income you actually receive may depend on a number of different factors, such as capital investment and profit-sharing agreements.... We will evaluate your work activity based on the value of your services to the business regardless of whether you receive an immediate income for your services. We determine whether you have engaged in substantial gainful activity by applying three tests. If you have not engaged in substantial gainful activity under test one, then we will consider tests two and three. The tests are as follows:

(1) Test One: You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business. Paragraphs (b) and (c) of this section explain what we mean by significant services and substantial income for purposes of this test.

(2) Test Two: You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.

(3) Test Three: You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

(b) What we mean by significant services.

(1) If you are not a farm landlord and you operate a business entirely by yourself, any services that you render are significant to the business. If your business involves the services of more than one person, we will consider you to be rendering significant services if you con-

tribute more than half the total time required for the management of the business, or you render management services for more than 45 hours a month regardless of the total management time required by the business.

\*    \*    \*    \*    \*    \*

(c) What we mean by substantial income. We deduct your normal business expenses from your gross income to determine net income. Once we determine your net income, we deduct the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others. Miscellaneous duties that ordinarily would not have commercial value would not be considered significant.... We will consider this amount to be substantial if-

(1) It averages more than the amounts described in § 404.1574(b)(2); or

(2) It averages less than the amounts described in § 404.1574(b)(2) but it is either comparable to what it was before you became seriously impaired if we had not considered your earnings or is comparable to that of unimpaired selfemployed persons in your community who are in the same or a similar business as their means of livelihood.

20 C.F.R. § 404.1575(a)-(c).

For the period from 1980 to 1989, the regulations provided that if a claimant earned more than $300 a month, the claimant was presumed to have engaged in substantial work activity. 20 C.F.R. § 404.1574(b)(2). If the claimant earned less than $190 a month, the claimant was presumed not to have engaged in substan-

tial work activity. 20 C.F.R. § 404.1574(b)(3). For the period from January 1990 to June 1999, the amounts were raised to $500 and $300, respectively. *See Byington v. Chater*, 76 F.3d 246, 250 (9th Cir.1996); *Soria v. Callahan*, 16 F.Supp.2d 1145, 1149 (C.D.Cal.1997). Where monthly earnings fall between these amounts, other information is to be considered, including whether a claimant's "work is comparable to that of unimpaired people in [the claimant's] community who are doing the same or similar occupations as their means of livelihood, taking into account the time, energy, skill, and responsibility involved in the work," and whether the claimant's "work, although significantly less than that done by unimpaired people, is clearly worth [$300 or $500, depending on the applicable time period], according to pay scales in [the claimant's] community." 20 C.F.R. § 404.1574(b)(6)(iii)(A) and (B). *See Soria*, 16 F.Supp.2d at 1150.

In *Petersen v. Chater*, 72 F.3d 675 (8th Cir.1995), the claimant was denied disability benefits by the Commissioner after a finding by the ALJ that the claimant was engaging in substantial gainful activity as a self-employed farm manager. During the relevant period, the claimant had rented the farm to a tenant and then had enrolled the farm in the Department of Agriculture's Conservation Reserve Program. The ALJ found the claimant had "engaged in substantial gainful activity— the ultimate question—because he 'materially participated in management of his farm operation.'" *Id.*, 72 F.3d at 677 (citing 20 C.F.R. §§ 404.1575(b)(2),[8] 404.1082(c)).

---

**8.** "Material participation" by a farm landlord in the farming operation, as referenced in 20 C.F.R. § 404.1575(b)(2), is defined as follows:
Material participation.
    (i) If you show that you periodically advise or consult with the other person,

who under the rental arrangement produces the agricultural or horticultural commodities, and also show that you periodically inspect the production activities on the land, you will have presented

The issue before the Eighth Circuit Court of Appeals was "whether [the claimant's] activities in managing the rented farm [were] 'substantial gainful activity' that preclude a finding that he is disabled." *Id.*, 72 F.3d at 676. The court determined the ALJ's analysis was inadequate under the applicable regulations, reasoning as follows:

> While the record supports a finding that [the claimant] "materially participated" in the management of his farm ..., the ALJ made no finding that [the claimant] received "substantial income." Therefore the ultimate finding that he engaged in substantial gainful activity is unsound.

*Id.*, 72 F.3d at 677. In holding the administrative record would not support the necessary "substantial income" finding, the court relied, in part, on the fact that the claimant had a net farm loss on his federal income tax return for the year in question. The court also noted the absence of sufficient evidence in the record to allow application of the tests for income from self-employment set out in 20 C.F.R. § 404.1575(a). *Id.*, 72 F.3d at 678.

In *Byington v. Chater*, 76 F.3d 246 (9th Cir.1996), Byington was a self-employed welder from 1985 to March 1989, owned and operated an auto shop from March 1989 to August 1990, bred quarter horses from 1979 to 1987, and drove a school bus beginning in September 1988. His welding operation entailed mostly odd jobs which he performed without assistance. He initially had a partner in the auto shop, but his partner left in November 1989. Byington worked in the auto shop for ten hours a day, five to six days a week. His quarter horse breeding operation required four to five hours of labor every day. The ALJ found Byington was engaged in substantial gainful activity as a self-employed shop owner, and he therefore was not entitled to benefits.

The district court reversed, holding that because Byington reported a net loss on his 1990 income tax returns, his work in the auto shop did not constitute substantial gainful activity in 1990. The district court also held Byington's income from driving a school bus did not constitute substantial gainful activity because his earnings from that job were less than $300 per month. *Id.*, 76 F.3d at 249.

The court of appeals reversed and upheld the ALJ's findings, noting Byington's "self-employed earnings are a factor in a determination of whether his work amounted to substantial gainful activity, but as the regulations make clear, are not determinative. *See* 20 C.F.R. § 404.1575(a)." *Id.*, 76 F.3d at 250. The court found, "By the numbers of hours worked, the duties Byington performed, and his level of responsibility, the ALJ was correct in finding that Byington's activities amounted to substantial gainful activity." *Id.*, 76 F.3d at 249–50. The court held the ALJ's findings were adequate, noting the ALJ cited " 'factors such as hours, skills, energy output, efficiency, duties, and responsibilities,' " in concluding Byington's " 'work activity is comparable to that of an individual who performs the same or similar business activities in [Byington's] community.' " *Id.*, 76 F.3d at 250 (quoting ALJ's opinion).

strong evidence that you are materially participating.

(ii) If you also show that you furnish a large portion of the machinery, tools, and livestock used in the production of the commodities, or that you furnish or advance monies, or assume financial responsibility, for a substantial part of the expense involved in the production of the commodities, you will have established that you are materially participating.

20 C.F.R. § 404.1082(c)(3).

In *Dierks v. Apfel,* 63 F.Supp.2d 1028 (D.Neb.1999), the court affirmed the denial of benefits to a claimant who operated a home business, finding the claimant's activities amounted to substantial gainful activity. The court held as follows:

Although the evidence shows that [the claimant] had relatively little net income during 1994 and 1995 after subtracting various self-employment expenses, it is clear that: (1) [the claimant's] work as a registered professional engineering consultant for the City of Chadron and other private clients, and as the owner of a manufacturing company, required significant mental activities, even though he engaged in such activities on a part-time basis; (2) such work was done for pay or profit, whether or not a profit was actually realized; (3) [the claimant's] experience, skills, responsibilities, and registration as a professional engineer contributed substantially to the operation of his consulting and manufacturing businesses since he was the sole participant in these businesses; and (4) although [the claimant] received little net income in 1994 and 1995, [the claimant's] work activity was worth $500 per month *"when considered in terms of its value to the business,"* 20 C.F.R. § 404.1575(a)(2) (emphasis added), especially when considering that (a) the City of Chadron and other private clients were willing to pay [the claimant] $40.00 per hour for his engineering services (an indication of the value of [the claimant's] professional services to his business), and (b) [the claimant's] net income in the first two years of his new businesses is not an accurate representation of the value of his services to his business[es]. 20 C.F.R. §§ 404.1572, 404.1573, 404.1575.

*Id.,* 63 F.Supp.2d at 1032–33.

The *Dierks* court noted, "Other courts have reached analogous results," citing the following cases:

*Johnson v. Sullivan,* 929 F.2d 596 (11th Cir.1991) (affirming termination of benefits pursuant to 20 C.F.R. § 404.1575(a)(2) because claimant found to be engaging in substantial gainful activity as licensed surveyor from home; claimant's experience, license, and mental contribution to business were substantial and enabled the business to continue, even though he was relegated to drawing maps and signing plats made by family members participating in the business; noting that income is less reliable as indicator of "substantial" nature of work when claimant is self-employed; claimant had income of $800 per month); *Rollins v. Shalala,* 19 F.Supp.2d 1100 (C.D.Cal.1994) (affirming denial of benefits for substantial gainful activity when self-employed dentist working two days per week grossed $4,000 per month, indicating significant value of dentist's services, but consistently operated at a loss due to expenses), *aff'd,* 77 F.3d 490, 1996 WL 62687 (9th Cir.1996) (table); *Strahan v. Shalala,* 1994 WL 543029 (S.D.Tex.1994) (affirming Secretary's decision that claimant was engaged in substantial gainful activity when he owned and operated a television transmitter, but operated at loss, when claimant failed to present documentary evidence showing that his services were not worth at least $300 per month; ALJ properly found it was claimant's intent to operate business for profit, even if television station was operating at a loss; "Work may be gainful even if no profit is realized if it is of the kind usually done for pay or profit."); *Barber v. Sullivan,* 765 F.Supp. 58 (W.D.N.Y.1991) (affirming ALJ's alternative finding that home insurance agency in which plaintiff—a licensed insurance agent—worked from four to eight hours per month was sub-

stantial gainful activity under 20 C.F.R. § 404.1575(a)(2) when considered in terms of value to business because plaintiff's business depended upon his singular role as business decision-maker).

*Id.,* 63 F.Supp.2d at 1033.

In *Krumme v. Califano,* 451 F.Supp. 941 (W.D.Mo.1978), the ALJ found the claimant was not disabled because after his alleged disability onset date, he "continued to demonstrate his ability to perform farm management functions" of a farm he allegedly had turned over to his son. *Id.,* 451 F.Supp. at 942. To support this finding, the ALJ relied on the following evidence in the administrative record: (1) on the claimant's income tax return, he itemized deductions indicative of the active management of the farm; (2) on his depreciation schedule, he continued to purchase equipment after he allegedly turned the farm over to his son; (3) he told his doctor he was a part-time farmer; and (4) at the ALJ hearing, he testified his son, in addition to maintaining the farm, held a full-time job elsewhere. *Id.,* 451 F.Supp. at 942–43. The district court remanded the case to the Commissioner for a further hearing. The court discussed the difference between the receipt of income from capital assets, which would not disqualify a claimant from receiving benefits, and receiving income from the active management of a business, which would disqualify a claimant from receiving benefits. The court pointed out that "the owner of a business may derive substantial income from the business without losing his disability benefits so long as he is not actively engaged in managing the business." *Id.,* 451 F.Supp. at 943 (citing, *inter alia, Walker v. Gardner,* 266 F.Supp. 998, 1002–03 (S.D.Ind.1967) (sharecropper tenant who received profit from his children's labor was entitled to disability benefits because he was physically unable to engage in substantial gainful activity himself.))

*See also Cerrone v. Shalala, supra,* 3 F.Supp.2d at 1179 ("An applicant disqualified from physical labor should not be disqualified from benefits by the mere fact that he received income from capital assets; however, when he is able to derive substantial income from actively managing a business, he is not disabled.")

In *Krumme,* the court was not persuaded the evidence in the record supported a finding that the claimant had engaged in substantial gainful activity. The court found there was insufficient evidence in the record to prove the plaintiff "did in fact contribute significant managerial expertise" to the farm enterprise. *Id.,* 451 F.Supp. at 944. The court discounted the evidence from the tax returns, explaining, "The fact that the plaintiff shows itemized expense deductions such as depreciation expense on his tax returns in no way indicates that plaintiff is physically involved in the management of his farm." *Id.* The court also was not persuaded by the references to "part-time farmer" in the claimant's medical records. *Id.*

### B. Analysis of the Record

Weiland, his wife, and his son all testified that Weiland had not performed substantial gainful activity in the hatchery or livestock business during the relevant period. Relying on other parts of their testimony and other evidence in the record, the ALJ found otherwise. Specifically, the ALJ concluded Weiland's "involvement in the livestock operation and hatchery meets the test for substantial gainful activity as a self-employed individual." (R. 41) The court now will examine the record to see if the greater weight of the evidence supports the ALJ's conclusion.

In her brief, the Commissioner notes the ALJ relied on various references to the hatchery in Dr. Parker's records to find Weiland had engaged in substantial gainful

activity. (Doc. No. 14, p. 7) The court does not find these records to be particularly probative. While Weiland repeatedly told Dr. Parker he was *involved* in a hatchery business (*see* R. 310, 317, 321, 322, 323, 325, 341, 344, 411, 412, 416, 418, 421), he never told Dr. Parker anything to sustain a finding that his involvement constituted substantial gainful activity. In fact, he told Dr. Parker he had to enlist the help of his family because he was unable to run the hatchery business on his own. (R. 418)[9] In any event, the ALJ did not rely on Weiland's physical contributions to the hatchery and livestock business to find Weiland had engaged in substantial gainful activity, but relied almost entirely on Weiland's "mental activity" in managing these operations. (*See* R. 39–41, 42) In her brief, the Commissioner cites numerous references in Dr. Parker's medical records to Weiland's management activities at the hatchery. (*See* Doc. No. 14, pp. 7–8) For example, Weiland told Dr. Parker he had been trained as a "hatchery manager." (R. 325) On a disability questionnaire, Dr. Parker stated Weiland "can only do the managerial function" at the hatchery (R. 416). Dr. Parker also noted in his records that Weiland "does run a hatchery (R. 321)," Weiland "is self-employed at a hatchery (R. 412)," and the hatchery "has gone relatively well for him (R. 322)."[10]

While references in Dr. Parker's records support a conclusion that Weiland performed some of the management functions at the hatchery, they do not sustain a conclusion either that (1) these management functions were significant to the operation of the business, or (2) Weiland received a substantial income from performing those functions. *See* 20 C.F.R. § 404.1575(a)(1). The court will look elsewhere in the record to determine whether substantial evidence exists to support either of these conclusions.

In her brief, the Commissioner states, "Plaintiff took orders for chicks and made arrangements to obtain the necessary number of eggs and make them available for pick-up (R. 74–75)." (Doc. No 14, p. 8) In fact, the testimony cited by the Commissioner was as follows:

Q [By Weiland's attorney] When it was operating what, what was it that caused the order of eggs to come to your acreage? Is it something that—tell, tell us how that came about.

A [By Weiland] People would call and place orders. There was some customers would buy 1,000, 1,500 at a time, and raise them up for re-sale.

Q A customer I gather would call the Wieland [sic] home and ask for 1,000 chicks. Is that -

---

**9.** On May 7, 1992, Dr. Parker did list certain duties he felt Weiland was able to perform at the hatchery (*see* footnote 6, *supra*), but Dr. Parker never stated Weiland, in fact, performed those duties. On April 20, 1993, Dr. Parker stated Weiland had lifted some crates and moved them back and forth within the hatchery (R. 322), but on July 23, 1998, Dr. Parker noted Weiland had attempted to perform *some* of the *duties* at the hatchery requiring physical work, but was unable to tolerate it. (R. 344)

**10.** The Commissioner also argues, "In May 1992, Dr. Parker opined that Plaintiff could perform managerial duties as a cattle and hog farmer (Tr. 416)." (Doc. No. 14, p. 7) Page

416 of the record is the second page of a disability questionnaire that contains the following question: "What specific duties as a cattle and hog farmer is your patient unable to perform at this time? What specifically prevents him from performing these duties?" In response to this question, Dr. Parker stated Weiland was "unable to do any lifting. He can only do the managerial function." While this answer could be construed to be an opinion that Weiland was capable of performing managerial duties as a hog farmer, the inappropriate implication from the Commissioner's citation to this record is that Weiland was, in fact, performing those duties.

A Yes.

Q the start of it?

A Yes.

Q Then what happened?

A Then you'd call and place your order on eggs and they'd be shipped to you, and then it's when you put them in the incubator, Monday.

Q So if I understand correctly the, the person or the entity that wants the chicks calls the Wieland [sic] house and asks for 1,000 chicks. The Wieland [sic] house then calls somebody who provides the eggs and says deliver 1,000 eggs.

A Yes.

Q Then when the eggs are hatched the Weilands [sic] call -

A The customer.

Q the customer and they pick up the chicks. Is that right?

A Yes.

(R. 74–75). Nothing in this testimony establishes that Weiland personally "took orders for chicks and made arrangements to obtain the necessary number of eggs and make them available for pick-up."

The Commissioner also states, "[Weiland] made typical management decisions including when to buy and sell livestock (Tr. 91, 106, 115)." (Doc. No. 14, p. 8) On page 91 of the record, Weiland testified as follows in response to questions by the ALJ:

Q [By the ALJ] Who decided when to sell [the livestock]? Take them to market?

A [By Weiland] It's certain times of the year you just load them up and sell them.

Q You didn't have any input into that?

A Did I?

Q Yeah.

A Well I'd say it would probably be a good time to sell some of them -

Q Did you -

A—spring of the year.

(R. 91). On page 106 of the record, Mary Weiland testified as follows:

Q [By the ALJ] He wasn't excluded from, from the management of the business. When he, when he decided to go into the hatchery business, that was not your idea was it? It was his idea?

A [By Mary Weiland] No. I'm sorry. That was my idea.

Q Okay. It was your idea?

A Right.

Q Yeah. And, and he thought that was a good idea I assume?

A Well we talked about it, but I knew that he wasn't going to be able to do any job on his own, and I figured that if the hatchery, after we had talked about it we realized that you set the eggs at a certain time, which I could be there for. We could take the eggs out at a certain time, and if you plan it right, you can plan it so he wasn't there alone to do it, or couldn't do it.

(R. 106). On page 115 of the record, Cory Weiland testified as follows:

Q [By the ALJ] Did your father participate at all in the, the decision on the livestock operation? Was he interested in -

A [By Cory Weiland] Yeah.

Q —cattle and when they should be sold, and that type of thing?

A Yeah, he was, but I, I also pursued some of that myself. You know, I was, I'm quite active in farming myself now, so -

Q Are you a farmer -

A Yes.

(R. 115). Nothing in the above cited testimony establishes that Weiland "made typical management decisions including when

to buy and sell livestock," as claimed by Commissioner in her brief.

The Commissioner next states, "[Weiland] arranged for veterinary care and checked on the livestock (Tr. 92)." (Doc. No. 14, p. 8) On page 92 of the record, Weiland testified as follows in response to a question by the ALJ:

Q [By the ALJ] But, but as far as the decisions on calling the vets and, and that type of thing, supervising the cattle, and, and checking on them, and, and all of that, who did that fall on?

A [By Weiland] Well I checked them.

(R. 92). Again, the cited part of the record does not support the conclusion in the Commissioner's brief that Weiland arranged for veterinary care.

The ALJ commented, "There is no reasonable explanation as to how the claimant's wife could have handled the size of these operations in addition to full-time employment outside the home...." (R. 40) The record contains no quantitative evidence to support this conjecture. Weiland testified the hatchery required a total of three to four hours of labor a week. Weiland, his wife, and their son all testified that Weiland performed only about 10 to 20 percent of this work. The fact that Mary Weiland worked 40 hours a week outside the home did not preclude her and her children together from working two to three hours each week at the hatchery.

The ALJ commented that the evidence in the record established customers would contact the Weilands to place orders for a certain number of chicks. From this, the ALJ concluded as follows:

*Presumably,* the claimant was the individual who took such orders since his wife was employed during the day and

his children were in school during three months of the six months the hatchery was active and operating. Thus, the claimant would have been the individual [with] responsibility for determining whether orders could be filled and ordering the appropriate number of eggs to fill the orders.

(R. 40) *(emphasis supplied)*. There is no evidence to support this presumption, but even if Weiland answered the phone on occasion and took orders for chicks, this evidence would establish only that he was involved in the hatchery, a matter not in dispute, and not that his involvement amounted to substantial gainful activity.

With regard to the small livestock business the Weilands operated on their acreage, the ALJ notes sales of livestock increased between 1992 and 1995,[11] and this was "after the children left home." Actually, the record reflects the Weilands' only son, Cory, did not move out until as late as 1995, and even after he move out, he provided significant help with the livestock. There is no evidence in the record to establish that Weiland, contrary to the testimony of three witnesses, substantially participated in the operation or management of the livestock business. In fact, there is no evidence even to show that the amount of work required to operate and manage the business was significant.

In sum, the record supports only the following concerning Weiland's role in the hatchery and livestock operations during the relevant period:

(1) Weiland used his own funds and personal borrowings to finance the hatchery and livestock purchases.

---

11. The ALJ's reliance on this statement is particularly curious because this period of time is, for the most part, outside the period relevant to this case, which is June 18, 1987, to December 31, 1993.

(2) The livestock operation was year-round, but the hatchery operation was a six-month-a-year operation.

(3) Weiland and his son shared in making management decisions for the livestock operation.

(4) Weiland and his wife shared in making the management decisions for the hatchery operation.

(5) Weiland and his wife both were trained to operate a hatchery.

(6) Weiland checked the hatchery's incubators and made temperature and moisture adjustments twice a day.

(7) Weiland swept up egg shells at the hatchery.

(8) Weiland occasionally helped place eggs on trays at the hatchery.

(9) Weiland occasionally moved egg trays from one location in the hatchery to another.

(10) The hatchery required, at most, three to four hours of labor each week, and Weiland contributed, at most, 20 percent of the labor.[12]

(11) During the relevant period, the Weilands' federal tax returns indicated the following:

> (a) In 1987, the Weilands bought $35,404.19 in livestock for resale, and produced $14,117.65 in gross income, with a net income of $684.69.

> (b) In 1988, the Weilands bought $34,497.31 in livestock for resale, and produced $11,665.36 in gross income, with a net loss of -$223.51.

> (c) In 1989, the Weilands bought $34,066.60 in livestock for resale, and produced $14,918.07 in gross income, with a net loss of -$3,248.47.

> (d) In 1989, the Weilands had gross income from the hatchery of $5,028.29, and a net loss of -$1,478.86.

> (e) In 1990, the Weilands bought $54,643.82 in livestock for resale, and produced $19,550.38 in gross income, with a net loss of -$2,267.83.

> (f) In 1990, the Weilands had gross income from the hatchery of $5,767.30, and a net loss of -$936.81.

> (g) In 1991, the Weilands bought $57,118.21 in livestock for resale, and produced $19,667.05 in gross income, with a net loss of -$3,409.43.

> (h) In 1991, the Weilands had gross income from the hatchery of $3,809.65, and a net loss of -$603.64.

> (i) In 1992, the Weilands bought $43,355.00 in livestock for resale, and produced $13,777.00 in gross income, with a net loss of -$1,438.00.

> (j) In 1992, the Weilands had gross income from the hatchery of $6,106.00, and a net loss of -$1,183.00.

> (k) In 1993, the Weilands bought $72,664.00 in livestock for resale, and produced $20,514.00 in gross income, with a net loss of -$5,502.00.

> (l) In 1993, the Weilands had gross income from the hatchery of $6,208.00, and a net loss of -$1,065.00.

(12) Weiland was listed as the owner of the hatchery and livestock operations on some of the Weiland's tax records.

The court now must determine whether these facts establish that Weiland engaged in substantial gainful activity during the relevant time period.

## C. Application of Law and Facts to Weiland's Claim

"Substantial gainful activity" is the performance of substantial services with rea-

---

**12.** This means Weiland worked at the hatchery for less than one hour per week, or about 20 hours each year during the six-month period the hatchery was in operation.

sonable regularity, including where the person performing the services is self-employed. *Markham*, 601 F.2d at 534. If Weiland performed substantial services for the hatchery or the livestock operation with reasonable regularity during the relevant time period, and those services were "gainful," then he engaged in substantial gainful activity and is precluded from receiving DI benefits. 20 C.F.R. § 404.1520(a). "Gainful" work activity is work activity done for pay or profit, whether or not profit is realized. 20 C.F.R. § 404.1572(b).

"Substantial" work activity is work activity that involves doing significant physical or mental activities, including where activities are performed on a part-time basis. 20 C.F.R. § 404.1572(a). Because Weiland was self-employed and not receiving a salary from the hatchery or the livestock operation, to determine whether his services were significant, the court first must consider the nature of the work he performed. 20 C.F.R. § 404.1575(a).

The record reflects that during the relevant period, Weiland and his son shared in making management decisions for the livestock operation, while Weiland and his wife shared in making management decisions for the hatchery. Except for occasionally watering the livestock, Weiland performed none of the physical work involved in the livestock operation. At the hatchery, he checked the incubators and made temperature and moisture adjustments twice a day. He occasionally swept up egg shells, helped place eggs on trays, and moved egg trays from one location to another. He

also may have answered the phone and taken some orders. His work at the hatchery took about an hour a week.[13]

Obviously, Weiland's physical contributions to both businesses were minimal. However, that is only part of the inquiry. Activity can be significant if it is either physical or mental. 20 C.F.R. § 404.1572(a). The ALJ relied primarily on Weiland's mental activities (*i.e.*, the management services Weiland provided to the livestock operation and the hatchery) to find that Weiland had engaged in substantial gainful activity.

The court finds Weiland's work for the livestock operation and the hatchery was not substantial. While Weiland provided some management services to these businesses, the evidence does not prove his management services were substantial, or even that substantial management services were provided by anyone to the businesses; indeed, according to the witnesses who testified at the hearing, it appears the Weilands allowed the businesses to operate with little or no management. They sold livestock according to the time of the year. They ordered eggs for the hatchery when customers ordered chicks, but only kept the hatchery open for six months out of the year. They borrowed money to finance the livestock operation and the hatchery when they needed money. The lack of any real management probably explains, at least in part, why in the eleven years from 1987 to 1997, the Weilands lost a total of $61,673.86 on the businesses.[14] *See* chart, page 8, *supra*.

**13.** The court sees little significance in the fact that Mary Weiland listed her husband as the owner of the hatchery and livestock operations on their joint federal tax returns. There is no dispute in the record that both of these businesses were family operations. How the Weilands reflected ownership of the businesses on their tax returns has nothing to do

with whether Weiland engaged in substantial gainful activity for the businesses. *See Krumme*, 451 F.Supp. at 944.

**14.** In fact, in the eleven years from 1987 to 1997, the livestock operation generated a profit only once, a $684.69 profit in 1987, and in the nine years from 1989 to 1997, the hatchery never generated a profit.

Even if Weiland's activities were substantial, Weiland should not have been denied DI benefits under step one of the five-step analysis unless his work activity also was gainful. Since Weiland was self-employed, his income from the businesses would not be determinative of the gainfulness of his work activity. This is because the amount of income he actually received from his work activity depended on a number of different factors, such as capital investment, the market for the products sold, and the costs incurred in producing the products, and not just on the gainfulness of his work. *See* 20 C.F.R. § 404.1575(a). The value of his work activity must be evaluated based on the value of his services to the businesses regardless of whether he received immediate income from his services or the amount of that income. *Id.*

The regulations are instructive on how to determine whether substantial work activity of a self-employed individual also is gainful. There are three tests to use in making this determination. First, if a self-employed person has rendered services that were significant to the operation of a business and he received substantial income from the business, then he has engaged in substantial gainful activity. 20 C.F.R. § 404.1575(a)(1). "Substantial income" is defined as follows: "We deduct your normal business expenses from your gross income to determine net income. Once we determine your net income, we deduct the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others. Miscellaneous duties that ordinarily would not have commercial value would not be considered significant." 20 C.F.R. § 404.1575(c).

There is no direct evidence in the record to make specific calculations under 20 C.F.R. § 404.1575(c). It is clear from the record, however, that Weiland did not engage in substantial gainful activity under this test. Except for a small profit by the livestock operation in 1987, neither the livestock operation nor the hatchery had any net income during the relevant period. Deducting the reasonable value of the unpaid help by Mary Weiland and the Weilands' children would place both the livestock operation and the hatchery in a significant loss status in each year, leaving no income for Weiland himself in any year.

Because Weiland did not perform substantial gainful activity under the first test, two additional tests must be considered. 20 C.F.R. § 404.1575(a). Under the second test, if Weiland's work activity, such as hours, skills, energy output, efficiency, duties, and responsibilities, was comparable to that of unimpaired individuals in his community who were in the same or similar businesses as their means of livelihood, then Weiland engaged in substantial gainful activity. 20 C.F.R. § 404.1575(a)(2). The record is entirely devoid of any evidence that would suggest there were unimpaired individuals in Weiland's community whose means of livelihood was comparable to Weiland's work activities at the livestock operation and the hatchery. *See Petersen*, 72 F.3d at 678. Under the third test, if Weiland's work activity, although not comparable to that of unimpaired individuals, was clearly worth $300 a month before 1989, or $500 a month after 1989, when considered in terms of the value of the activity to the livestock business and the hatchery, or when compared to the salary that an owner would pay to an employee to do the work Weiland was doing, then he engaged in substantial gainful activity. 20 C.F.R. §§ 404.1575(a)(2) and 404.1574(b)(2). Again, there is no evidence in the record to prove Weiland's work activity was worth these amounts. In fact, it is highly unlikely that at the

time Weiland was working about an hour a month at the hatchery, his services were worth $500, or even $300, per month. Accordingly, under these three tests, Weiland's work activity was not gainful.

Because Weiland's work activity at the livestock operation and the hatchery was neither substantial nor gainful, the Commissioner should have proceeded to the second step of the five-step analysis.

## V. CONCLUSION

For the reasons discussed above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner to proceed with the remainder of the five-step analysis.

**IT IS SO ORDERED**.