# United States Court of Appeals
# FOR THE EIGHTH CIRCUIT

———————

No. 01-1951

———————

| | | |
|---|---|---|
| Dennis W. Pearsall, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri |
| Larry Massanari, Acting | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Appellee. | * | |

———————

Submitted: November 15, 2001

Filed: December 20, 2001

———————

Before BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and NANGLE,[1] Senior District Judge.

———————

NANGLE, Senior District Judge.

Dennis W. Pearsall appeals the denial of social security disability insurance benefits. Pearsall applied for benefits in June 1997 and alleges disability since January 1, 1997, stemming from urethral stricture disease, neurogenic bladder,

_____

[1] The HONORABLE JOHN F. NANGLE, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

learning disability and nervousness. After the Commissioner denied Pearsall's application initially and upon reconsideration, Pearsall was granted a hearing before an Administrative Law Judge (ALJ). The ALJ rendered a decision in which he found that Pearsall was not under a "disability" as defined in the Social Security Act. The District Court[2] affirmed the Commissioner's decision to deny benefits and we affirm the District Court.

## I.

At the time of the hearing in May of 1998, Pearsall was 48 years old. He has not been employed since 1977 when he worked in a Quick Shop Market. As early as December 1987, Pearsall sought medical treatment because of difficulty voiding. In January 1988, Pearsall also began seeking treatment for anxiety, nervousness, difficulty sleeping and appetite loss. At the end of January 1988, Pearsall's physician stated that Pearsall probably suffered from depression and described Pearsall's symptoms as "almost like panic attacks." Pearsall's physician then referred Pearsall to a urologist.

In March 1988, after performing urethra and bladder tests which had normal results, the urologist noted his belief that Pearsall's urinary retention was probably due to "a very high anxiety state." In March 1988, the urologist noted that he had discussed the need for psychological therapy and possibly nursing home admission for Pearsall and that he believed Pearsall's anxiety was causing his voiding problems. In April 1989, the urologist reported that Pearsall was still experiencing voiding problems and was using a suprapubic tube in order to urinate. In August 1989, the urologist noted that Pearsall was frequently having to self-catheterize in order to urinate and also noted his continuing belief that Pearsall's urological problems were

---

[2]The Honorable Dean Whipple, Chief Judge, United States District Court for the Western District of Missouri.

based on a "severe psychological disorder that exists between [Pearsall] and his mother." The urologist continued treating Pearsall throughout the 1990's.

In June 1997, Pearsall applied for disability benefits. In connection with this application, the Commissioner sent Pearsall to several consultative examinations. In August 1997, Dr. Robert King performed a physical exam on Pearsall. During the exam, Pearsall told Dr. King that he was last employed in 1977 at the Quick Shop Market and that his days were currently spent doing yard work, watching television, listening to music and occasionally going to the library. Dr. King noted that Pearsall did not necessarily have a learning disability, but he suspected that Pearsall was mildly mentally retarded. Dr. King noted that Pearsall had no difficulty sitting, standing, walking, lifting, carrying or handling objects or traveling. Dr. King saw no reason that Pearsall could not be gainfully employed.

In August 1997, Dr. David Lutz, Ph.D., performed an intelligence quotient (I.Q.) test on Pearsall. Dr. Lutz found that Pearsall's I.Q. was in the 80's, i.e. the low average range, that Pearsall appeared to suffer from anxiety during the testing and that Pearsall would participate in the testing only with considerable encouragement. Pearsall related his school, family and social history to Dr. Lutz and told Dr. Lutz that he currently enjoyed watching television, listening to music and going to the library where he checked out movies, compact discs and cassette tapes. Pearsall told Dr. Lutz that reading made his eyes tired. Pearsall said that he could follow simple recipes and had a good appetite but had trouble sleeping. Dr. Lutz concluded that while Pearsall had some difficulties and behavioral problems, and appeared to be immature and likely anxious, Pearsall "seemed capable of understanding and remembering at least simple and probably complex instructions. He also seemed capable of sustaining concentration and persistence on at least simple and possibly complex tasks."

After the Social Security Administration denied Pearsall's application for benefits and his request to reconsider, but before the hearing in front of the ALJ,

Pearsall was examined by Dr. Eva Wilson, Psy.D. Dr. Wilson reported that Pearsall "presented himself as an extremely nervous gentleman" who stuttered, smiled and acted in an "extremely nervous fashion" throughout the interview. She described Pearsall as "nervous, eccentric and very anxious to complete the interview" and as a person who "appears to be a loner who is very anxious and does not interact with others easily. . . .He appears to be a middle-aged gentleman who has always been indulged by his parents, at least by his mother, and continues to be."

Dr. Wilson diagnosed Pearsall as follows:

| | |
|---|---|
| Axis I: | 300.00 Anxiety disorder, NOS. |
| Axis II: | 301.9 Personality disorder, NOS, with dependent and avoidant characteristics. R/o 315.9 learning disorder, NOS. |
| Axis III: | Bladder and kidney surgery |
| Axis IV: | Employment problems, unemployment. |
| Axis V: | Current GAF (Psych) 60, moderate. Past year, 60, moderate. |

Dr. Wilson also completed a Medical Source Statement. In this statement, Dr. Wilson indicated that Pearsall was moderately limited in his ability: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to set realistic goals or make plans independently of others. Dr. Wilson also noted that Pearsall was not significantly limited in his ability to: perform activities within a schedule, maintain regular attendance, sustain an ordinary work routine, work in coordination with others and make simple work-related decisions. Finally, Dr. Wilson indicated that Pearsall was not significantly limited

in his ability to complete a normal work day and work week without interruption, ask simple questions, ask for assistance, maintain socially appropriate behavior and respond appropriately to changes in the work setting.

At the hearing, Pearsall testified that he was evaluated by Drs. Lutz and Wilson on behalf of the Social Security Administration. Pearsall further testified that he suffered from problems with anxiety, had difficulty being around people and concentrating, wanted to be left alone, and would go out from his home with his mother but has not gone out alone to visit friends in 25-30 years. Pearsall testified that he was 48 years old and had an eleventh grade education. He testified that, in a work setting, he would need to use the rest room at least once every 90 minutes. He said that he could read, but had difficulty because he needed glasses.

A vocational expert also testified at the hearing. The ALJ asked the vocational expert a hypothetical question about a person who had a neurogenic bladder, would require a permanent catheter change once a month, would need to urinate every 90 minutes, would occasionally suffer from incontinence, did not like to be around a lot of people, had some anxiety and problems concentrating and had some dependency characteristics. The vocational expert testified that such a person would be able to perform some jobs in the national economy, such as small parts assembler, cafeteria attendant, addresser or fishing reel assembler. Pearsall's attorney then asked the vocational expert about a hypothetical person subject to all of the limitations set forth in Dr. Wilson's Medical Source Statement. The expert responded that such a person would not be able to perform any work on a sustained basis.

In July 1998, the ALJ issued a decision denying disability benefits to Pearsall. The ALJ found that Pearsall's "testimony regarding the nature, severity and duration of his impairments is contradicted by the medical record." The ALJ noted that there was "some divergence of opinion among psychologists who have examined the claimant." The ALJ found that Dr. Lutz's opinion was supported by objective testing and a mental status examination and found Dr. Lutz's opinion that Pearsall "could at

5

least understand and remember simple instructions and sustain concentration and persistence on at least simple tasks" to be persuasive. By contrast, the ALJ found that Dr. Wilson's opinion was "not supported by objective testing" and therefore was "entitled to lesser weight."

## II.

On appeal, Pearsall asserts that: (1) the record as a whole did not support the residual functional capacity of Pearsall adopted by the ALJ; (2) substantial evidence did not support the ALJ's adoption of Dr. Lutz's medical opinion rather than Dr. Wilson's medical opinion; (3) the ALJ's reliance on the medical vocational guidelines found at 20 Pt. 404, Subpart P, Appendix 2 (the "Grids") was proscribed by the facts in this case; and (4) the hypothetical question that the ALJ posed to the vocational expert did not sufficiently relate all of Pearsall's impairments supported by the record.

To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Act. 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the familiar five-step sequential evaluation to determine disability: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998).

Our standard of review is narrow. "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. If, after reviewing the record, the Court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the commissioner's decision. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Even if we would have weighed the evidence differently, we must affirm the denial of benefits if there is enough evidence to support the other side. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

## A. Pearsall's Residual Functional Capacity (RFC)

A claimant's RFC is what a he or she can do despite his or her limitations. 20 C.F.R. §404.1545. It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Here Pearsall argues that the ALJ erred in determining that he had the residual functional capacity "for a full range of unskilled light exertional level work, which by definition does not require understanding, remembering, or carrying out complex or detailed instructions." We disagree.

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Subjective

7

complaints may be discounted if there are inconsistencies in the evidence as a whole. Id. at 1322. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (claimant's credibility is lessened by a poor work history). The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).

In this case, substantial evidence supports the ALJ's finding of Pearsall's RFC. The ALJ considered Pearsall's testimony and found it to be contradicted by the medical record. Specifically, the ALJ noted that Pearsall's allegations regarding poor memory and intellectual dysfunction were contrary to objective testing and persuasive medical evidence and that Pearsall's allegations of chronic pain from his bladder and chronic daytime incontinence were not supported by the medical record. The ALJ further noted that Pearsall was neither receiving psychological treatment nor had he been prescribed psychotropic medications and that his daily activities were not indicative of intense fears of crowds or people. The ALJ thus concluded that Pearsall's testimony as to the nature and severity of his symptoms was not credible.

The ALJ also considered the evidence and testimony of the various medical experts. The record as a whole shows that the ALJ properly considered Pearsall's testimony as to his alleged work-related restrictions (to the extent it was not discredited), Pearsall's medical records, and the observations of Pearsall's treating physician, a consultative physician and several psychologists. See 20 C.F.R. §§ 404.1545(a), 404.1546 (2001) (responsibility for determining RFC rests with ALJ; determination should be based on all relevant evidence, including claimant's own description of limitations, observations of treating physicians and others, and medical records). After examining the record, we conclude that the ALJ's functional capacity determination was supported by substantial record evidence.

**B.** **ALJ's assignment of greater weight to Dr. Lutz's medical opinion than to Dr. Wilson's medical opinion.**

Pearsall next argues that the ALJ committed error in assigning greater weight to Dr. Lutz's opinion than to Dr. Wilson's opinion. Pearsall contends that Dr. Lutz provided only the information for which he was asked–specific I.Q. findings–and did not render a definitive psychological diagnosis because he was not asked to do so. Pearsall argues that, by contrast, Dr. Wilson was asked to and did perform a more thorough assessment of Pearsall and make a definitive diagnosis. Pearsall argues that the opinions of Dr. Lutz and Dr. Wilson were not in conflict and the ALJ therefore erred by assigning greater weight to Dr. Lutz's opinion.

As a preliminary matter, we reject Pearsall's contention that Dr. Lutz's assessment of Pearsall was so narrow as to prevent it from being in conflict with Dr. Wilson's assessment. Contrary to Pearsall's contentions, Dr. Lutz did not simply administer an I.Q. test. Like Dr. Wilson, Dr. Lutz also assessed Pearsall's mental status and discussed with Pearsall his school, family, employment and social histories and the nature of his physical complaints and daily activities. Moreover, as the ALJ noted, Dr. Lutz's opinion was supported by the objective I.Q. test which he administered.

It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. See Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996); Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995). The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. Bentley, 52 F.3d at 786. Here, the ALJ considered the record as a whole and found Dr. Wilson's conclusions to be inconsistent with the rest of the record. The ALJ then concluded that Dr. Lutz's opinion was entitled to greater weight because it was "well supported by objective testing and his mental status examination" and was consistent with other record

evidence. We find that these were good reasons to grant controlling weight to Dr. Lutz's opinion.

Finally, even though Dr. Wilson's opinion, if it had been granted controlling weight, might have supported a finding of disability, we will not disturb the ALJ's finding of no disability because other substantial record evidence supports the ALJ's conclusion. An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (citing Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)). The record as a whole supports the ALJ's conclusion that Pearsall was not disabled.

### C.    The ALJ's Reliance on the Vocational Guidelines

As discussed above, the ALJ utilizes a five step analysis to determine whether a claimant is disabled. The claimant carries the burden of establishing that he is unable to perform his past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that he maintains the residual functional capacity to perform a significant number of jobs within the national economy. See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Once the burden shifts to the Commissioner at step five, the Commissioner can meet its burden through one of two means. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). Vocational expert testimony is required at step five "only when the claimant has nonexertional impairments, which make use of the medical-vocational guidelines, or 'grids,' inappropriate." Banks, 258 F.3d at 827.

10

Pearsall argues that because he has non-exertional limitations, the grids cannot support the Commissioner's burden at step five. Not only do we agree, but the ALJ evidently agreed as well. By relying on vocational expert testimony at step five, the ALJ found that Pearsall had nonexertional impairments which rendered reliance on the grids inappropriate. As the ALJ relied on the vocational expert testimony rather than on the grids at step five, we find no error here.

**D.     The ALJ's hypothetical question posed to the vocational expert**

Pearsall argues that the hypothetical question posed to the vocational expert failed to include all of Pearsall's impairments because it did not incorporate all of the limitations set forth in Dr. Wilson's medical source statement. We reject this argument. The ALJ asked the vocational expert whether jobs existed for a person who had a neurogenic bladder, would have a permanent catheter change once a month, would have to urinate every hour and a half and occasionally have an incident of incontinence, did not like to be around large numbers of people and had some problems with concentration and some anxiety and dependency characteristics.

The ALJ's hypothetical question properly included all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit. See Chamberlain v. Shalala, 47 F.3d 1489, 1495-96 (8th Cir. 1995) ("The record is clear that the hypothetical posed to the vocational expert sufficiently set forth [claimant's] impairments which the ALJ accepted as true. We will not disturb this finding on appeal.") (citations omitted). The vocational expert's testimony that Pearsall could perform work in the national economy therefore was substantial evidence in support of the ALJ's determination of no disability. See Miller v. Shalala, 8 F.3d 611, 613-614 (8th Cir. 1993); Andres v. Bowen, 870 F.2d 453, 455-56 (8th Cir. 1989). The ALJ did not include all of the limitations found by Dr. Wilson because he gave greater weight to the findings of Dr. Lutz, and instead properly based his hypothetical question on Dr. Lutz's opinion and other record evidence.

For the reasons stated above, we affirm the district court's judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.