**Genia RAPP, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:08–cv–399–JAJ.**

United States District Court, S.D. Iowa, Central Division.

Nov. 4, 2009.

Gail Lynn Barnett, Max Schott & Associates PC, Des Moines, IA, for Plaintiff.

Christopher D. Hagen, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits and supplemental security income. This court finds that the decision of the Social Security Administration is not supported by substantial evidence. The final decision of the Commissioner of Social Security is reversed and remanded for an award of benefits.

## I. PROCEDURAL BACKGROUND

Plaintiff Genia Rapp (hereinafter "Rapp") filed an application for Disability Insurance Benefits on February 21, 2006, alleging an inability to work from April 30, 2004 (Tr. 95–97). The Social Security Administration ("SSA") denied Rapp's application initially and again upon reconsideration (Tr. 47–48, 49–50). Administrative Law Judge ("ALJ") George Gaffaney held a hearing on Rapp's claim on December 19, 2006 (Tr. 19–46). The ALJ denied Rapp's appeal on July 18, 2007 (Tr. 7–18). Rapp filed a request for review on September 12, 2007 (Tr. 5, 494–496). The Appeals Council denied her request for review on August 6, 2008 (Tr. 1–4). Rapp filed this action for judicial review on September 30, 2008 (Dkt. 1).

## II. FACTUAL BACKGROUND

At the time of the hearing, Rapp was thirty-six years old. She was thirty-four at the time of her alleged disability onset date. Rapp graduated from high school and attended one year of college (Tr. 27). Her vocationally relevant work experience includes work as an answering service representative, resort manager, data entry clerk, store production manager, customer service clerk, insurance clerk, and call center representative (Tr. 118, 126–138).

### A. Relevant Medical History

Rapp alleges disability based on a number of physical impairments causing pain. These include: degenerative disc disease of the lumbar spine, spinal stenosis, right hip dysplasia, degenerative arthritis, status post bilateral knee surgery, gastroesophageal reflux disease, migraines, and depression (Tr. 117, 13). She alleges pain in her lower back, right hip, both knees, and both hands (Tr. 29–32).

### 1. Knees

In March of 2003, a bone scan revealed arthritic changes in her knees (Tr. 374). In May of 2003, Dr. Breedlove indicated that the bone scan revealed moderate crepitus, tenderness and slight swelling in the parapatellar region (Tr. 381). In July of 2003 she underwent an operative arthroscopy of the left knee with lateral retinacular release and tibial tubercle osteotomy (Tr. 378). A few weeks later on August 5, 2003, Dr. Breedlove noted that Rapp was "doing very well" two weeks status post operative arthroscopy (Tr. 382). On September 30, 2003 Dr. Breedlove again noted she was "doing very well", had an "excellent range of motion" and "walks with a normal gait" (Tr. 383).

The following year on June 15, 2004, while her range of motion was still "excel-

lent", x-rays showed "a healed tibial tubercle osteotomy and a prominent tibial screw". Id. Dr. Breedlove noted "Painful hardware, left knee". Id. Four months later on October 15, 2004, Rapp "underwent hardware removal of the left knee post tibial tubercle osteotomy" (Tr. 384, 355–56).

The following year on August 26, 2005, Rapp reported "having difficulty with her right knee which she states is identical to her right [sic] knee symptoms prior to surgery" (Tr. 384).[1] She was diagnosed with "significant chondromalacia" on September 12, 2005, and a physical examination revealed "a tremendous amount of patellofemoral crepitus bilaterally" and the "right side seems worse than the left" (Tr. 385). She subsequently underwent right knee arthroscopy, chondroplasty, patellofemoral joint and medial femoral condyle, with arthroscopic lateral releases (Tr. 386). A week and a half later, on October 10, 2005, the surgeon Dr. Ian Lin noted that "patient is doing well" and "not having any more crepitus in her knee". Id. She was "moving her knee quite well" and had a "relatively normal" gait. Id. She did not show up for a subsequent appointment on October 31, 2005 scheduled to see how she was doing. Id.

### 2. Right hip

On April 1, 2003, an MRI showed a benign bone tumor in Rapp's right hip (Tr. 375). She was diagnosed with fibrous dysplasia of the hip in May 2003 and treated for it with curettage and internal fixation (Tr. 387, 391). In one hip-related appointment in November of 2004, Dr. Buckwalter noted that she had a "normal activity level" (Tr. 395). In March of 2005, she complained of thigh pain when walking long

---

1. The context of this note seems to indicate that Dr. Breedlove meant to say "left knee symptoms prior to surgery", given that at that time she had had left knee surgery, not right knee surgery.

distances, which Dr. Buckwalter speculated might be due to "her multiple back problems and complicated spinal problems". At the same time, a bone scan of her right hip and survey of the rest of her skeleton showed periarticular uptake in the great metatarsophalangeal joints of both feet in keeping with joint-centered process such as degenerative joint disease (Tr. 273).

In a visit to the doctor for back pain in late April of 2005, Dr. Quam noted that Rapp had stepped off a center block and she fell down injuring her right hip area (Tr. 416). Her general care provider Dr. Schossow treated her on April 18, 2005, noting right hip pain because she fell getting out of a camper, missed a step and fell two feet onto her right hip (Tr. 289).

On June 6, 2005, Dr. Buckwalter noted that, in connection with her fibrous dysplasia, Rapp had "persistent discomfort over the 2–hole side plate and screw" and said it is "possible she has a bursa or is having irritation due to the side plate" (Tr. 392). At that time, Dr. Buckwalter noted a "severe reduction in activity level" and the radiology report noted "residual or recurrent fibrous dysplasia in the right proximal femur with the inferior interlocking screw of the right hip broken with possible osteolysis of the dynamic screw (Tr. 400)." Later that year in August Dr. Buckwalter noted that while she did not complain specifically of a hip problem that day, Rapp said her principal problem was her back pain which sometimes radiates down the back of her right hip into the posterior thigh over the distribution of the sciatic nerve (Tr. 389).

In February of 2006, Dr. Buckwalter again noted a "severe reduction in activity level" and that Rapp was a "Homemaker but unable to perform all activities because of original problem", but that Rapp's "general sense of well-being" was "great" (Tr. 387, 479).

3. *Lower back*

Rapp's chief complaint is her lower back pain. On March 4, 2004, she complained of pain in her lower back and was angry when no x-rays were taken; the doctor explained that x-rays would not explain the pain (Tr. 341–347). In late March of 2004, Dr. Sykes examined her and noted that there was point tenderness over the lower lumbar spine especially in the L3 through L5 area (Tr. 255). Rapp had pain when pressure was applied over the facets joints at L4 and L5 bilaterally. *Id.* Based upon the exam and the results of an MRI, Dr. Sykes diagnosed Rapp with "Moderate degenerative disk disease at L4–L5 and L5–S1 with bilateral facet arthritis at these levels as well" (Tr. 254). He noted "This is causing low back pain syndrome and pain into bilateral buttocks". *Id.* Medical images around the same time were interpreted to reveal "spinal stenosis at the L4–5 level" (Tr. 352) and "degenerative disk changes at the L4–5 and L5–S1 levels (Tr. 353)." Radiologist George Brown noted on March 17, 2004 that "the patient does have congenital spinal stenosis with very short pedicles at the L4 and L5 levels. This makes even mild degenerative change have a significant impact upon the spinal canal" (Tr. 351). He went on to note Rapp's "mild to moderate diffuse disc bulge". *Id.*

Based on his diagnosis, Dr. Sykes treated Rapp with lumbar epidural steroid injections and injection of the L4 and L5 facet joints bilaterally (Tr. 254), and lumbar medial branch blocks (Tr. 414). In early April she began treatment with Dr. Quam, a pain management specialist. She complained of pain "in the low back and into the hip and down the side of her legs" (Tr. 241). Dr. Quam diagnosed her with degenerative disk disease of the lumbar spine, lumbar pain, lumbar facet syndrome, and sacroilitis *Id.* "He noted that palpation of the lumbar, paravertebral, and

sacroiliac areas revealed tenderness in the lower lumbar and sacroiliac areas" (Tr. 242). Dr. Quam performed lumbar medial branch blocks × 8 bilateral at L2–L3, L3–L4, L4–L5, and L5–S1 with bilateral sacroiliac joint injection (Tr. 241).

After this treatment, Rapp did very well for about three weeks. However, by May 4, 2004, she complained of a return of her low back discomfort, mainly on the right side, to the same level as she had before the injections (Tr. 213). The medication she was taking was not giving her the desired improvement. *Id.* Tenderness to the touch was noted again in the lower back (Tr. 214).

Dr. Quam performed a different procedure the next month, on May 10, 2004: a seven level radiofrequency denervation, L1 through S2 on the right (Tr. 225). Two weeks after the procedure, Rapp found her pain suppressed, at least on the right side (Tr. 201). The left-sided pain, on the other hand, had grown, and on May 28, 2004, Dr. Quam performed the seven level radiofrequency denervation of L1 through S2 on the left (Tr. 201). A letter from Dr. Quam to Blue Cross Blue Shield justifying the procedures indicated that Rapp experienced "signficant improvement" on both sides (Tr. 414–415).

However, in January of 2005, Rapp returned to Dr. Quam with complaints of low back pain with radiation into her buttocks and down her right lower extremity (Tr. 412–13). She had done well until November of 2004 when she irritated her right hip and started having pain in her low back thereafter. *Id.* Physical examination again revealed tenderness in her low back. *Id.* From January of 2005 until December of 2006, Rapp consistently sought treatment for low back pain from Dr. Quam (Tr. 404–421). She again received lumbar medial branch blocks in February 2005, but experienced only short-lived improvement (Tr. 418). In each of these visits she complained of low back pain except for one visit on March 21, 2005, in which she rated her pain 0/10 and said she was not having any low back pain, but did have right hip pain (Tr. 411). In another appointment, a note was made that she was "pain-free" (Tr. 470). In all the other, almost monthly appointments over the course of two years, she rated her pain between 4 and 8 out of 10, occurring 100% of the time (Tr. 404–421, 436–439, 482–483, 490–493). She stated that aggravating factors included sitting, standing, standing to do dishes, walking, and weather change. *Id.* Alleviating factors were relaxing, medication, and heating pad use. *Id.*

### 4. *Other*

On October 3, 2003, Rapp was treated for a chief complaint of chest pain and pain in her right side (Tr. 360). She was given Toradol 30 mg and reported "pain much better" (Tr. 358).

Rapp has also complained of migraines, and on April 15, 2004 she was seen for migraines (Tr. 333–338), complaining that she had had three that week (Tr. 337). On September 14, 2005 she was seen for vomiting (Tr. 274–84), and she complained of a migraine the day before (Tr. 275).

Updates of Rapp's condition after she initially filed her claim for disability reveal that she was subsequently treated for heartburn and dysphagia (Tr. 440–446).

### B. *Treating physician assessments*

On March 28, 2006, Dr. Schossow wrote a letter responding to SSA's request for information concerning Rapp, stating:

> Ms. Rapp has been treated on an intermittent basis for spinal stenosis, lumbar facet syndrome, severe degenerative disc disease, degenerative arthritis and post-operative arthritis in her right femur. During that time, she has undergone multiple epidural steroid injections.

She has been on multiple nonsteroidal anti-inflammatory medications. She has been through multiple various therapies. Currently, she is relatively stable on a combination of Hydrocodone, Flexeril and Lyrica.

She remains disabled due to the severe disease in her lumbar spine. She is unable to lift or carry. She is unable to walk or sit for any extended period of time. Standing can also induce pain. She is unable to stoop, climb or kneel.

(Tr. 422). On July 11, 2006, he wrote a similar letter in response to a second request for information from SSA, stating much of the same information, and adding:

She does suffer from chronic pain, which limits her activities, particularly as pertains to physical labor, such as lifting, carrying, standing, stooping, kneeling, or crawling.

(Tr. 447).

Shortly before Rapp's hearing before the ALJ, Dr. Schossow filled out a form responding to questions from SSA (Tr. 485–486). Dr. Schossow stated Rapp's medical condition as (1) severe lumbar DJD, (2) hip dysplasia—s/p open fixation, (3) hypertension, (4) neuromathic back [illegible] pain 2 degrees # 1, (5) gastroesophageal reflux, (6) depression. *Id.* Asked whether he thought she was capable of performing any job on a sustained basis in a routine work setting, he answered: "She may be able to work in a sedentary, cognitive setting, but I do not believe she is capable of sustained *physical* labor" (emphasis original). *Id.* He also stated that her claim that she must lie down at least once a day for two hours to alleviate pain is consistent with her medical condition, and that whether her pain would result in three or more work absences a month was "difficult to predict". *Id.*

Dr. Schossow agreed that Rapp could lift and/or carry 20 pounds occasionally, and could lift and/or carry 10 pounds fre-

quently. He disagreed with the proposition that she could stand and/or walk (with normal breaks) 6 hours in an 8 hour workday, saying "She has fibrous hip dysplasia and has had open curettage and fixation. There is a broken fixation screw in her hip; I doubt she can stand or walk enough to satisfy this requirement". *Id.* He did not comment whether she could stand at least two or less than two hours in a day. He also disagreed that she could sit (with normal breaks) six hours in an eight hour workday, saying "It would appear she would need frequent position changes", without saying how frequent. *Id.* He agreed that she was capable of "continuous reaching, handling, fingering, feeling". *Id.*

Dr. Quam also filled out the same form shortly before the ALJ hearing (Tr. 488–89). He stated Rapp's medical condition as radiculitis lumbar, deg. disk dz lumbar, spinal stenosis, facet syndrome lumbar. He said course of treatment was medication management, and the prognosis was that her diagnosis was not reversible. *Id.* Asked whether he thought she was capable of performing any job on a sustained basis in a routine work setting, he answered: "Pt unable to work 8 hrs a day 5 days a week due to variable condition due to her diagnosis. Pt pain varies with environmental factors." *Id.* He also stated that her claim that she must lie down at least once a day for two hours to alleviate pain is consistent with her medical condition, and that whether her pain would result in three or more work absences a month was "unknown." *Id.*

Dr. Quam disagreed that Rapp could lift and/or carry 20 pounds occasionally, saying she could only lift and/or carry less than 10 pounds occasionally. *Id.* He disagreed that she could lift and/or carry 10 pounds frequently, saying she could only lift and/or carry less than 10 pounds frequently. *Id.* He disagreed that she could

stand and/or walk (with normal breaks) 6 hours in an 8 hour workday, and said less than two hours standing and/or walking was a more appropriate answer. *Id.* He also disagreed that she could sit (with normal breaks) for 6 hours in an 8 hour workday, saying she must alternate positions. *Id.*

### C. Consultative Examinations

On April 27, 2006, Dr. Mary Greenfield, M.D. completed a Physical Residual Functional Capacity Assessment of Rapp, in which she opined that Rapp could occasionally lift and/or carry 10 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and was unlimited in her ability to push and/or pull (Tr. 425). Dr. Greenfield found that Rapp should only occasionally climb a ramp, stairs, a ladder, rope, or scaffolds, and should only occasionally balance, stoop, kneel, crouch, or crawl (Tr. 426). In explaining these limitations, she commented:

Kneeling and crawling less than 1/3 related to patellofemoral chondromalacia for which she has undergone surgery.

(Tr. 426). Asked whether there are treating/examining source conclusions about the claimant's limitations or restrictions which were significantly different from her findings, Dr. Greenfield answered yes. She commented as follows:

This is an initial concurrent claim with an AOD of 10–30–04. Claimant is a 36 year old female who alleges disability on the basis of spinal stenosis, sacroiliitis, lumbar facet syndrome, DDD, and benign bone tumor right hip. Evidence in file indicates that claimant underwent surgery in 5–03 for fibrous dysplasia of hip and continues to be followed at UIHC, most recently in 2–06. X-rays showed good position of hardware. She did report back pain that she stated precluded all activity but she also, incon-

sistently, stated that her overall sense of well being was that she felt great. Local notes reveal that her pain has fluctuated over the time period from no pain in 3–05 to 8/10 100% of time. Her reports of aggravating factors also fluctuate and at time she notes that it is worse with walk sit and stand and at others it is with walking long distance and at others there are various combinations. She was seen in the ER for falling out of a camper and has been advised to exercise regularly. At the onset a note states she had normal activity level. A primary care MSS states she can't lift or carry at all and is unable to walk or sit extended periods; standing can also cause pain. This opinion is given little weight since it is more restrictive than claimant's report that she can lift 10 pounds. She does state that she can walk, sit, and stand for only 15 minutes at a time though this hadn't been quantified in the medical records. Yet, her hobbies are sewing and crosstitching and she stated these haven't changed since her onset. Claimant does have MDIs that could be limiting, however, the inconsistencies noted above result in significant erosion of credibilit [sic] of allegations. Claimant can lift and carry 10 pounds occasionally and frequently, stand and walk for at least 2 hours in an 8 hour day but not likely 6, and sit for 6 hours with regular breaks and the ability to stand and stretch for periods of less than two minutes at her workstations.

(Tr. 425–26).

On July 27, 2006, Leisl McIntosh submitted a Request for Medical Advice concerning Rapp, saying "36 year old claimant alleges spinal stenosis, lumbar facet syn., DDD, arthritis, bone tumor, acid reflux. RFC in file is ready to sign, which will deny her" (Tr. 448).

A day later, Dr. James Wilson, M.D., completed a Physical Residual Functional Capacity Assessment of Rapp, in which he affirmed every one of Dr. Greenfield's findings (compare Tr. 450–455 with Tr. 425–430). He commented:

> This 36 year old claimant has alleged disability due to spinal stenosis, lumbar facet syndrome, degenerative disk disease, arthritis, bone tumor, and acid reflux. AOD is 10–30–04. The claimant's medical history has been well-summarized on 4–27–06 and will not be repeated here. At reconsideration, she has added that she now has acid reflux. No other changes or worsening has been reported. Updates from the pain clinic and UIHC indicate that her condition is stable. Dr Schossow has sent a statement indicating that she is stable as well, but has not provided specific limitations. The evidence shows that the claimant is s/p upper endoscopy with esophageal dilation. At followup in July, 2006 it is noted that she is "heartburn free" and able to swallow without any difficulties. Though the claimant does have medically determinable impairments as outlined on 4–27–06, the medical evidence supports that she would be capable of performing at the levels indicated on the enclosed RFC. There are no specific credibility issues.

(Tr. 456).

### D. Hearing Testimony

ALJ George Gaffaney held Rapp's hearing on December 19, 2006. At the time of the hearing, Rapp was 36. Vocational expert ("VE") Carmen Mitchell also testified.

Regarding her back, Rapp testified that she had had problems with her back since high school, but they became more pronounced in 2004 when her back went into a muscle spasm (Tr. 29). She testified that her pain is in her lower back, and runs down her right side into her toes (Tr. 29). She described her pain as usually achy, but sometimes "sharp, sharp pain" (Tr. 29). Muscle spasms occur once a month which require about three days to recover from (Tr. 30). Walking for an extended period of time or sitting for too long aggravate the pain (Tr. 30). She can walk for one block with her doctor-prescribed cane (Tr. 30). She can stand or sit for no more than ten to fifteen minutes before feeling pain (Tr. 31). She quit her job as a customer service representative because she was having back pain sitting six to six and a half hours at a time (Tr. 28–29). She can lift about five pounds (Tr. 31).

Rapp also testified about pain in her right hip, which has a plate and screw (Tr. 31). A lot of standing or sitting aggravates the pain in her hip (Tr. 32).

Rapp also testified about problems with her hands cramping up because of degenerative arthritis (Tr. 32). She can only cross-stitch for ten to fifteen minutes before having problems (Tr. 33). She can only type on a keyboard for about ten minutes before having problems.

Rapp also testified about problems with her knees; she has had swelling and pain in both knees on and off since 2003 (Tr. 31). She testified she has migraine headaches three or four times a month, varying with weather and sinuses (Tr. 35). Each lasts from one to four hours (Tr. 35). She testified she takes Effexor for depression, which helps to an extent (Tr. 36).

She testified that she takes hydrocodone, Lyrica, a muscle relaxer, and ibuprofen (Tr. 34). Side effects include drowsiness, forgetfulness, and feeling spacey (Tr. 34, 36). She takes naps once or twice a day for a couple of hours, because of the pain and the medication (Tr. 34–35). Rapp smokes half a pack of cigarettes a day, though her doctors have told her to quit (Tr. 28).

Rapp testified that she is able to do very little housekeeping (Tr. 38). She does the dishes, but she has to sit down every five minutes for twenty to twenty-five minutes to rest (Tr. 38). She cooks simple meals; her kids help her do laundry and grocery shopping, especially lifting and carrying (Tr. 38–39). She cannot drive more than a half an hour without stopping to rest (Tr. 39). She has had to give up swimming and walking, and reading has become harder because of concentration problems (Tr. 40). She does some cross-stitching and cross-word puzzles, but can only do them five or ten minutes before having to move around (Tr. 39–40). She has to go to bed for two to three hours one to two times a week (Tr. 37).

Rapp testified that her back pain and arthritis keep her from working (Tr. 26). She testified she would not be able to do the sitting and typing for long periods of time at a data entry or low physical job (Tr. 40).

The ALJ asked the vocational expert three hypothetical questions. The first was:

"I'll limit lifting to 10 pounds occasional and five frequent; stand two hours in an eight-hour workday, sit for six. With regard to nonexertional, no ladder-climbing; the rest, occasional: stair-climbing, balance, stoop, kneel, crouch, and crawl. Occasional exposure to extremes of cold, vibrations, and hazards such as heights and moving parts. With this residual functional capacity, could any of the past relevant work be performed?"
(Tr. 43)

The vocational expert answered yes. Such an individual could be an answering service rep, insurance clerk, and data entry clerk, both as Rapp did them and per the Dictionary of Occupational Titles (DOT) in the national economy. Such an individual could also be a customer service clerk not as Rapp did it (because of lifting), but as per the DOT (Tr. 43).

The ALJ asked the second hypothetical:

"same as number one, but I'll add a change of positions from standing to sitting, and vice versa, every 30 minutes. Slight positional change. Let, let me revise that. Slight positional change every 30 minutes when standing, and every 30 minutes when sitting. With that addition, could any of the past relevant work be done?" (Tr. 43)

The vocational expert answered that the same jobs could be done (Tr. 44). The third hypothetical added that the individual would be unable to complete an eight-hour workday. The vocational expert answered that the past relevant work could not be performed on a full-time, competitive basis, and that there was no job which such an individual could perform on a full-time competitive basis (Tr. 44).

Rapp's attorney asked the vocational expert two additional hypotheticals. First, the attorney added to the second hypothetical that the individual required an additional break for two hours each day in addition to regularly scheduled breaks. The vocational expert answered that "there would be no work on a full-time competitive basis, if that's during the actual eight-hour workday." (Tr. 44) Second, the attorney added to the second hypothetical that the individual would miss three or more days of work per month (without the two-hour break requirement). The vocational expert answered that such an individual "would not be able to maintain full-time, competitive employment." (Tr. 45)

### III. CONCLUSIONS OF LAW

#### A. Scope of Review

■ In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence

appearing in the record as a whole. *See Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir.2006). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir.2008)(internal quotes omitted). The court must take into account evidence that fairly detracts from the ALJ's findings, as well as evidence that supports it. *Id.* (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 589 (8th Cir.2004)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. *Gunnels v. Bowen,* 867 F.2d 1121, 1124 (8th Cir.1989); *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

*B. ALJ's Disability Determination*

Determining whether a claimant is disabled involves a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1364 n. 3 (8th Cir.1990) (citing *Yuckert,* 482 U.S. at 140–42, 107 S.Ct. 2287); 20 C.F.R. § 404.1520(a)-(f):

■ "To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *Id.*

At the first step, the ALJ found that Rapp had not engaged in substantial gainful activity since her alleged onset date (Tr. 13). At the second step, the ALJ determined that Rapp had the following severe combination of impairments: degenerative disc disease of the lumbar spine, spinal stenosis, right hip dysplasia, status post bilateral knee surgery, gastroesophageal reflux disease (GERD), migraines and depression (Tr. 13). The ALJ found that the specific mental impairment of depression alone is nonsevere (Tr. 14). At the third step, the ALJ determined that Rapp's impairments did not meet or equal

one of the listed impairments (Tr. 15). At the fourth step, the ALJ determined that Rapp has the RFC to perform the full range of sedentary work (Tr. 15), including past relevant work as an answering service representative, insurance clerk, data entry clerk or customer service clerk (Tr. 18). Thus, the ALJ found, the claimant is not disabled (Tr. 18).

Rapp makes two main arguments, both concerning the ALJ's determination of the RFC prior to the fourth step.

### C. ALJ's Credibility Determination

Rapp argues that the ALJ erred in assessing her credibility, and thus erred in determining her RFC. The ALJ found that while Rapp's alleged symptoms could be reasonably caused by her medically determinable impairments, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 16)

■■■ When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Finch*, 547 F.3d at 935 (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997)). In evaluating a claimant's credibility, the ALJ must look to the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski*, 739 F.2d at 1322. Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir.2001). "The credibility of a claimant's subjective testimony is primari-

ly for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir.2001); *see also Finch*, 547 F.3d at 935 (internal citations omitted). The court will "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir.2006)(internal citation omitted).

Here, the ALJ reviewed Rapp's testimony (Tr. 16), then found Rapp's statements concerning the limiting effects of her symptoms "not entirely credible" (Tr. 16). He then reviewed the medical evidence, finding that the objective evidence "fail[ed] to provide strong support for the allegations of symptoms which produce significant limitations on the claimant's ability to perform basic work activities." (Tr. 16). Beyond this statement, nothing in his review of the medical evidence indicated any reason to disbelieve the subjective allegations of Rapp (Tr. 17). Rather, the ALJ's review of the medical evidence points only to the parts of the record indicating the troubles Rapp was not having ("no obvious fracture", "no obvious muscle atrophy") (Tr. 17) and parts of the record indicating that some of her treatment was helpful ("Toradol, which provided good relief"; "she was receiving treatment from a pain specialist which was helpful") (Tr. 17). To the extent that the ALJ notes the portions of the medical evidence suggesting pain (e.g., "findings also included evidence of degenerative changes, mild, diffuse disc bulge and mild bilateral facet osteoarthritic changes") (Tr. 17), the medical evidence as reviewed by the ALJ is consistent with Rapp's subjective allegations of pain.

The ALJ implicitly provides reasons for disbelieving Rapp's subjective allegations of pain in the course of evaluating the severity of Rapp's mental impairments at steps 2 and 3 of the five-step evaluation

(Tr. 14). In the course of this discussion, the ALJ stated that although Rapp has alleged "extreme pain", "her daily activities describe a more active lifestyle than would be expected if she were experiencing such a degree of pain", citing some of Rapp's testimony about things she does each day, leaving out the limitations in doing those things to which she testified (Tr. 14). The ALJ also stated that although Rapp testified her medications make her "spacey", she does some things that indicate she has some ability to concentrate, again leaving out the limitations in doing those things to which she testified (Tr. 14).

The ALJ's credibility determination, then, rests on findings of Rapp's daily activities which are incomplete. The ALJ found that "she described driving her children to school each morning" (Tr. 14), without noting that she testified she cannot drive more than a half an hour without stopping to rest (Tr. 39). The ALJ found that she enjoyed cross stitch and crossword puzzles (Tr. 14), without noting her testimony that she can only do those for five to twenty minutes before having to move around (Tr. 39–40). The ALJ found that "she did laundry" (Tr. 14), without noting that she stated both on her questionnaire and at the hearing that her sons carry the loads for her (Tr. 38, 145). The ALJ found that "she cleaned her house" (Tr. 14), when her answer at the hearing to the question "Are you able to do any housekeeping?" was "Very little" (Tr. 38), she stated "Housework is done in 15 min incrimints [sic]" on her questionnaire (Tr. 140), and she testified she has to take a 20–25 minute break every five minutes when doing the dishes (Tr. 38).

■ Insofar as the ALJ's rejection of Rapp's allegations of subjective pain is based on these findings, it is not supported by substantial evidence. *Accord Keller v. Shalala,* 26 F.3d 856, 859 (8th Cir.1994)(finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache). The record in this case does not reveal inconsistencies that warrant discrediting Rapp's testimony.

The Commissioner argues that the ALJ's credibility finding should be affirmed because the ALJ articulated the inconsistencies on which he relied in discrediting Rapp's subjective complaints. Other than those noted above, which rely on an incomplete picture of Rapp's testimony, it is difficult to find such articulations of inconsistency in the ALJ's opinion. The Commissioner's attempts to find inconsistencies himself in his brief and attribute them to the ALJ find little support in the ALJ's opinion itself.

The court finds that the ALJ's credibility finding is not supported by substantial evidence in the record.

### D. ALJ's Determination of Residual Functional Capacity

Before considering step four of the evaluation process above—whether the claimant can perform past relevant work—the ALJ must first determine the claimant's residual functional capacity (20 CFR §§ 404.1520(e) and 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe (20 CFR §§ 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96–8p).

■ Determining a claimant's residual functional capacity is a medical

question. *Lauer v. Apfel*, 245 F.3d 700 (8th Cir.2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir.2000). "The Commission must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir.2000); 20 CFR § 404.1545 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

The ALJ found that Rapp "has the residual functional capacity to perform the full range of sedentary work" (Tr. 15). In particular:

. she can occasionally lift ten pounds and five pounds on a frequent basis; stand two hours in an eight hour day with a slight positional change every 30 minutes; sit six hours in an eight hour day, with a slight positional change every 30 minutes; cannot climb ladders, but is able to perform all other non exertional tasks (climbing, balancing, stooping, crouching, kneeling and crawling) on an occasional basis. She can tolerate occasional exposures to extremes of cold, vibrations and hazards such as heights and moving parts.

(Tr. 15).

 In making this finding, the ALJ accorded "considerable weight" to the opinions of both Dr. Schossow and Dr. Quam, Rapp's treating physicians. Indeed, "[i]f a treating source's medical opinion about the nature and severity of the claimant's impairments is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source is entitled to controlling weight." *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir.2006)(citing § 416.927(d)(2)). The ALJ gave Dr. Schossow's opinion considerable weight "due to the regular treating relationship and clinical findings referenced" (referring to medical records and assessments) (Tr. 17). Likewise, though Dr. Quam had a shorter treating relationship than Schossow, as the ALJ noted, his opinion was given considerable weight also because his assessment was similar to Schossow's (Tr. 17).

Rapp argues that in determining her residual functional capacity, the ALJ did not properly evaluate the evidence. According to Rapp, while the ALJ asserted that he gave "considerable weight" to the opinions of both treating physicians—Dr. Schossow and Dr. Quam—he did not incorporate all parts of their opinions into the residual functional capacity he found Rapp to have. The ALJ, says Rapp, gave no reason for omitting parts of the treating physicians' opinion in finding her residual functional capacity to permit sedentary work, and quotes language from other circuits saying "the ALJ may not pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of non-disability." *Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir.2004); *Switzer v. Heckler*, 742 F.2d 382, 385 (7th Cir.1984).

The Commissioner counters that the ALJ considered all of the evidence and substantial evidence in the record supported his conclusions. By limiting Rapp to sedentary work, the ALJ adopted the opinion of treating physician Dr. Schossow, the Commissioner argues. The Commissioner argues that there are conflicting opinions available, and the ALJ properly resolved the conflicting evidence before him, which would be appropriate. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007)("As there is conflicting evidence on the record, the ALJ's determination ... does not lie outside the available zone of choice.").

The ALJ's findings noted above are mostly in line with those of the treating physicians Dr. Schossow and Dr. Quam, but not entirely. With regard to standing two hours in an eight hour day, the ALJ found that Rapp could do so with a slight positional change every 30 minutes (Tr. 15). While Dr. Schossow disagreed with the statement that Rapp could stand and/or walk six hours in an eight hour workday, and commented

> she has fibrous hip displasia and has had open curettage and fixation. There is a broken fixation screw in her hip; I doubt she can stand or walk enough to satisfy this requirement

(Tr. 485), he did not comment whether she could stand and/or walk two hours in an eight hour workday. Dr. Quam similarly disagreed with the six-hour requirement, and did state that a more appropriate answer would be "less than 2" (Tr. 488). Here, the ALJ's opinion conflicts with the opinion of one of the treating physicians, but not the opinion of the other. In choosing one opinion over the other, the ALJ acted appropriately, as "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir.2001)(internal citations omitted).

With regard to sitting six hours in an eight hour day, the ALJ found that Rapp could do so with a slight positional change every 30 minutes (Tr. 15). While Dr. Quam disagreed with the statement that Rapp could sit (with normal breaks) 6 hours in an 8 hour workday, he circled "Or must alternate positions" (Tr. 488). Dr. Schossow similarly disagreed with the statement that Rapp could sit (with normal breaks) 6 hours in an 8 hour workday, stating "It would appear she would need frequent position changes" (Tr. 485). Both doctors declined to say how frequent such changes would need to be (Tr. 485, 488);

thus, the ALJ's determination that Rapp could sit for six hours "with a slight positional change every 30 minutes" cannot be said to conflict with the treating physicians' opinions. Rapp also argues that the ALJ omitted key non-exertional limitations noted by both Dr. Schossow and Dr. Quam—namely, Rapp's need for a two-hour rest during the workday. Dr. Schossow stated that Rapp's claim that she must lie down at least once a day for two hours is consistent with her medical condition (Tr. 486). Dr. Quam said the same, adding that "pt does better with 2 hour rest daily" (Tr. 489). The ALJ, by contrast, made no finding that Rapp had such a need. The vocational expert testified at the hearing that if an individual needed such a break during the actual eight-hour workday, there would be no work on a full-time, competitive basis (Tr. 44). Thus, the treating physicians are in agreement that Rapp needs a 2–hour break each day, and that this would change her ability to perform any work, yet the ALJ did not consider this evidence in finding Rapp's RFC.

As noted above, "If a treating source's medical opinion about the nature and severity of the claimant's impairments is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source opinion is entitled to controlling weight." *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir.2006)(citing § 416.927(d)(2)). There is not substantial evidence in the record contradicting this opinion of two treating physicians that Rapp needs a 2–hour break each day. Therefore, this opinion is controlling.

The ALJ's hypothetical question to the vocational expert on which he rested his finding of no disability did not include the requirement that Rapp take a 2–hour break during the workday. Therefore, because the question "does not include all of

the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, [the] vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Baker v. Apfel,* 159 F.3d 1140, 1144 (8th Cir.1998).

The Commissioner, in arguing that the ALJ considered all the evidence, recognizes that the ALJ did not adopt every possible limitation that could be derived from one of the treating physician's (Dr. Quam's) opinion. However, the Commissioner does not address the 2–hour break requirement and the ALJ's failure to incorporate this important feature of the two treating physicians' opinions on which they both agree.

The court finds that this record does not contain substantial evidence supporting the ALJ's finding of no disability.

### E. Conclusion

The vocational expert, when posed hypothetical questions properly crediting the medical evidence and Rapp's subjective complaints, testified that Rapp was precluded from engaging in full-time competitive employment. The ALJ's decision to the contrary is not supported by substantial evidence in the record as a whole and must be reversed.

Upon the foregoing,

IT IS ORDERED that the decision of the ALJ is hereby reversed and remanded for an award of benefits. The Clerk of Court shall enter judgment accordingly.